FILED _____ ENTERED
_____ LODGED _____ RECEIVED

MAY 2 ? 2014   LK

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| Officers Robert Mahoney (#6296), Sjon Stevens (#6180), Cliff Borjeson (#7597), Christopher Myers (#5452), and 122 other Officers of the Seattle Police Department named below,<br><br>    Plaintiffs,<br><br>vs.<br><br>Eric H. Holder, Jr., individually, Attorney General of the United States, and employees of the Department of Justice, individually, named below,<br><br>The City of Seattle, including the Seattle Police Department, the Seattle Police Monitor Team, and the Seattle City Attorney's Office,<br><br>Ed Murray, individually and in his official capacity, Mayor, City of Seattle, and former Mayors, individually, named below,<br><br>Chief of Police, Seattle Police Department, individually and in his/her official capacity, and former Chiefs, individually, named below,<br><br>Peter Holmes, individually and in his official capacity, Seattle's City Attorney,<br><br>Merrick Bobb, individually and in his official capacity, Seattle Police Monitor, and members of the Monitoring Team, individually and in their official capacities, named below,<br>    Defendants. | Civil Action No. **C14-0794** MJP<br><br>CIVIL RIGHTS COMPLAINT UNDER 42 U.S.C. §1983 and 28 U.S.C § 1331 |

## I. SUMMARY OF CLAIMS

Defendants have promulgated and imposed new use of force (UF) policies and

practices in reckless and deliberate indifference to the protections afforded Plaintiffs by the

Constitution: **(1)** The UF policies and practices unreasonably restrict and burden Plaintiffs' right to use force reasonably required, to protect themselves and others, from apparent harm and danger, in violation of the **Second**, **Fourth, Fifth,** and **Fourteenth** Amendments of the Constitution. **(2)** The new UF policies and practices require - without appropriate consideration of an officer's knowledge, training, experience, or the apparent danger of the circumstances confronting him or her - that Plaintiffs use significantly less force than is being threatened against them by suspects. This includes, for example, prohibiting Plaintiffs from using reasonable and effective force tools or techniques against vaguely defined, newly protected classes of suspects unless deadly force is the only other option. This significantly increases the likelihood that such persons will get killed or seriously injured in encounters with the police - a terrible result and a violation of those suspects' rights - as well as a clear violation of constitutional protections afforded Plaintiffs to reasonably protect themselves and others from threats of harm. **(3)** In the balancing of interests required by the Fourth Amendment, Plaintiffs' right not to be required to take unnecessary risks with their personal safety in the performance of their duties are consistently violated, by the UF policies and practices, in favor of suspects' alleged rights in situations where suspects appear to be or are engaged in threatening and dangerous conduct. **(4)** The UF policies and practices work to undermine and destroy the longstanding totality-of-the-circumstances standard for making, analyzing, and reviewing officers' reasonable UF decisions by undermining, at each step, the integrity of officers' judgments as a whole. **(5)** The Court requires UF standards to be simple, practical and useful to the officer doing his or her job. The new UF Policy clearly is not. In some places it is overly complicated and contradictory, in other places overly precise and mechanical, but throughout, requires Plaintiff to engage in mental gymnastics wholly

unreasonable in light of the dangerous and fast evolving circumstances we face every day. This creates unnecessary and, therefore, unconstitutional risks to Plaintiffs' safety. **(6)** The UF policies and practices require Plaintiffs to under-react to threats of harm until we have no choice but to overreact. This makes it inevitable - although unnecessary and unreasonable - that officers and citizens will get killed or seriously injured. Moreover, the policies and practices are designed to trap Plaintiffs into violations even where Plaintiffs did, or could have, acted in a completely reasonable and justifiable manner under the law. This places unconstitutional risks and burdens on Plaintiffs' lives and livelihood and necessarily subjects them to the very second-guessing prohibited by the Constitution. **(7)** The UF policies and procedures attempt to fundamentally alter longstanding principles and standards governing acceptable and lawful police conduct, thus significantly altering the terms and conditions of Plaintiffs' employment, including potentially interfering with Plaintiffs' rights to qualified immunity for their reasonable uses of force, without Plaintiffs having had any meaningful opportunity to participate and be heard in the process.

## II. JURISDICTION and PARTIES

1. Plaintiffs, sworn officers of the Seattle Police Department (SPD), bring this action under 42 USC § 1983 against the City of Seattle, including the SPD, and certain City of Seattle (City) employees, including Mayors, Chiefs of Police, and the Seattle Police Monitor (Monitor) and his staff (Monitoring Team), alleging that Defendants have deprived Plaintiffs of the rights and protection secured for them by the Second, Fourth, Fifth and Fourteenth Amendments of the Constitution under color of policies and practices of the

City related to Plaintiffs' use of force in their interactions with threatening or resisting suspects.

2.  Plaintiffs also have a cause of action, under 28 USC §1331, against the United States Attorney General (AG) and certain officials of the U.S. Department of Justice (DOJ). DOJ officials are a party to the consent decree under which the UF policy has been implemented in order to remedy an alleged pattern and practice of excessive UF. Moreover, it is clear from this case as well as other DOJ investigations around the Country that DOJ's explicit goal is to re-write longstanding policing standards around use of force in a manner that conflicts with the Constitution. Though the Monitor is paid by the City, it has been made clear to the City that the Monitor will not find the City in compliance until the City and SPD establish and implement new UF policies and practices that include the unconstitutional standards dictated by DOJ.

3.  A complete list of Plaintiffs, including badge numbers and contact information is attached to this Complaint. A complete list of Defendants, with contact information, is also attached.

## III. INTRODUCTION

4.  It is unfortunate that we have to file this complaint. Plaintiffs emphatically agree with Defendants that 'constitutional policing is effective policing'. Moreover, notwithstanding the reams of paper, and huge bills for the City being generated by DOJ and the Monitor, there is one, simple goal and point of agreement that addresses the entirety of DOJ's investigation of SPD: "The goal of the Parties in entering the Settlement Agreement is to ensure that SPD's use of force is consistent with the requirements of the United States

Constitution." SPD and the City agreed to this - **and only this** - even as they adamantly disagreed with DOJ's findings of excessive force. Accordingly, SPD and the City agreed to develop a UF Policy consistent with the constitutional standards and principles set forth in *Graham v. Connor*.

5. What SPD and the City have drafted instead, however, with heavy-handed oversight by DOJ and the Monitor, is a policy that wholly disregards the Court's clear prioritization of the practical safety issues facing police officers over burdensome policy requirements, in light of the Court's understanding of the dynamics of threatening and violent encounters with suspects. The new policy substantially undermines the constitutional protections and rights afforded Plaintiffs - asking us to take unreasonable risks with our safety and our lives. As a consequence, it leaves the public significantly less safe as well.

6. Research shows, overwhelmingly, that police officers under-react and hesitate in the face of threats of violence, and are often killed or seriously injured as a result. Moreover, the Court expressly is cognizant of this country's long history of armed violence, particularly by suspects against police officers. Thus, overwhelmingly, standard police doctrine, policy and best practices, based on decades of related case law, require officers first and foremost to assess the threat presented by the suspect, and to react reasonably in response to the threat, without delay or hesitation. By contrast, the new UF Policy requires patrol officers to focus, not on the nature of the threat, but instead to recall pages and pages of confusing and often contradictory factors, qualifiers, analyses, and special considerations for certain classes of suspects, which greatly impairs the decision-making process for officers. This is especially problematic considering that these decisions are often made under extremely difficult, emotionally-charged and dangerous circumstances where time-

consuming and nuanced analysis is virtually impossible. The UF policy further induces hesitation because officers are fearful of censure and sanction should their actions, in hindsight, be judged to have violated any of a number of layers of rules and provisions that invite conflicting interpretation. What is more, the policy requires that many UF decisions be made, and judged, after-the-fact, based on the 'actual threat', rather than the 'reasonably perceived threat', which has long been the constitutional standard for both police officers and citizens. The real-world effect of this UF Policy is to induce a reluctance by patrol officers to use appropriate and sufficient levels of force to control dangerous suspects. It effectively creates hesitation and paralysis by analysis that puts officers, suspects and the general public at greater risk of injury or death, as a situation that might have been quelled early on is allowed to spiral to increasingly higher levels of violence because the officer uses too little force too late. The new policy is the type of policy the Court has consistently rejected. The Court has time and again overturned allegedly "helpful," but overly prescriptive and mechanical rules and policies under the Fourth Amendment, in favor of simple and practical policies that defer to officers' actual knowledge and experience on the street. It is a policy that places compassion for suspects' difficulties and conditions (perhaps not misplaced in other contexts) squarely at odds with Plaintiffs' and the publics' safety. As courts consistently hold: a threat of danger is a threat of danger, regardless of the suspect's mental or other impairments that may be contributing factors to a suspect's dangerous criminal behavior.

7. Not surprisingly, there is already evidence of significant problems wrought by the new UF Policy. Aside from evidence that officers are hesitating and/or failing to use appropriate and lawfully justified force to address threats safely and effectively, there is

evidence of a dramatic decrease in proactive police work to investigate and stop crime. Officers are turning in their TASERS in large numbers - even though such devises provide reasonable and effective tools when facing threatening conduct - because Plaintiffs are confused about how and when we can use them and see too great a possibility for unreasonable discipline under the UF Policy. Patrols officers will testify to an insidious new hesitation to respond to calls for backup. We are increasingly unsure how much help we can offer since our responses are so burdened and constrained by the UF Policy, and whether or not providing backup is worth the risk of unreasonable disciplinary action or termination. This hesitation has only increased as, Plaintiffs will testify, we are now being brought in to headquarters like criminal suspects and subjected to intimidating, non-consensual recorded interviews for conduct that was widely accepted as effective and lawful policing just a few months ago. Meanwhile, first responding officers, required by the UF Policy to delay and avoid immediately resorting to force, are left unnecessarily and unreasonably vulnerable when backup fails to come, and the delay and avoidance tactics fail to bring the threat under control. Plaintiffs will present evidence of a significant increase, that began even before the policy became final, in injuries to patrol officers because we are hesitating to respond to threats with adequate and reasonable force.

8.   Citizens are feeling vulnerable as patrol officers avoid acting in reasonable response to threats to public safety. Publicized cases include incidents where officers have done nothing, or retreated from suspects who threatened the officer with death or serious physical injury, leaving the officer, other officers on the scene, and the public unnecessarily exposed to serious danger or death. Not surprisingly, in published articles,

bystanders have expressed anger and concern at what they see as sworn officers' failure to protect innocent people. The bold, new disregard for police authority in the streets of Seattle - as evidenced, for example, by a recent letter by more than 40 individuals and officials who wrote to the Mayor asking for immediate enforcement resources to deal with increasingly violent incidents downtown - is the natural and logical consequence of a policy that so decisively places the interests of criminal suspects ahead of the rights and interests of officers, citizens, and the City.

9. There are other serious risks to Plaintiffs' safety created by the new UF Policy. It is so long, complex and contradictory that Washington State Criminal Justice Training Commission (CJTC) personnel have stated that they have no idea how to conduct training for it, and therefore will not. Plaintiffs will testify to being significantly less sure of how to police under the new UF Policy even than when we first became police officers. Moreover, as the new policy is implemented, it is becoming increasing clear that our fears are in fact the new reality: We are being judged under an impossible standard that puts our lives at unnecessary and therefore unreasonable risk. Plaintiffs have taken the opportunity to observe meetings of the Use of Force Review Board (UFRB) which, under the new policy, is required to review every Type II and III UF incident. This includes, for example, any time a patrol officer takes down a suspect in order to arrest him or her, and the suspect "complains" that there was an injury (as the overwhelming majority of criminal suspects reflexively and glibly do when placed under arrest). In specific cases where patrol officers have had practical, safety reasons for their conduct due to the danger of the situation and threat created by the suspect, the Monitor, who was in attendance, emphatically stated: "Practical considerations never trump this

policy." This is completely wrong, and a 180 degree contortion of the Court's holdings which consistently prioritize officer safety over mechanical applications of policy, particularly when the suspect has engaged in unlawful threatening behavior.

10. What has become increasingly clear is that the new standard for police conduct under the UF Policy is perfection, as determined in 20/20 hindsight by inexperienced, untrained civilians and non-patrol officers from the safety of a desk or committee room. This standard of perfection was expressed previously by Defendant McGinn in his "Vision for the Future," when he promised that Seattle police officers using force "will get it right every time." Perfection, however, is totally at odds with the Constitution. Perfection can never be a realistic, fair, or appropriate standard when patrol officers are required to regularly confront, and protect the public from, people who commit crime, abuse drugs and alcohol, fail to take prescribed medications, behave violently, have access to dangerous weapons, are often mentally ill, and do not care whether or not their actions conform with the law or the rules of society. Requiring the impossible of patrol officers will result in less effective policing and in unreasonable and unnecessary risks to our lives and livelihood.

11. These are **not** problems that can be tweaked, adjusted to, or trained around, with "self-analysis," over some arbitrary transitional period, as suggested by the Monitor. As the allegations of this Complaint make clear, serious misinterpretations and misapplications of long-standing legal principles - and the unconstitutional risks created thereby - are at the core of the new policy and impact every aspect of it.

12. These pervasive and systemic problems have been created, ironically, in response to DOJ's **highly suspect** evidence of alleged excessive force, and even though DOJ's

findings themselves make clear that excessive use of force is an issue - if at all - only for a tiny minority of SPD officers. DOJ demanded and imposed the new UF Policy, acknowledging that almost all the cases where it alleged excessive use of force "involve[d] people with mental illness, or people under the influence of drugs and alcohol." It then ignored the consistent and cumulative evidence regarding the magnitude of the crisis involving untreated mentally ill individuals in urban areas across the United States, and the intersection between untreated mental illness and drug abuse, dangerous and unpredictable behavior, and violence involving guns and other deadly instruments. DOJ demanded policy changes without meaningful consideration of recognized use of force science, which consistently discredits the core "pause and deliberate" strategies imposed by DOJ. It also ignored research regarding both the physiology of decision-making under tense, uncertain, and rapidly unfolding circumstances, and the disadvantage facing officers who, by definition, operate behind the reactionary curve when they are called to respond to the threatening conduct and behavior of suspects. Most significantly - considering DOJ's role as the Nation's enforcer of the Constitution - DOJ made its findings and imposed its remedy without regard for the longstanding standards regarding use of force under that very Constitution.

13. As sworn police officers, we have undertaken a dangerous occupation, and each day we knowingly accept its accompanying risks. We participate in continuing and extensive training regarding suspects' rights and have never sought a blank check on using force. Nor are we insensitive to the problems facing the mentally ill. In fact, we are uniquely called upon to cope with their plight first-hand, every day. What this Complaint alleges is that we cannot be required to take unnecessary and, therefore, unreasonable risks with

our lives and our safety.  That, while we consistently are called to the scene of the dangerous epicenter of a societal crisis not of our making, we cannot be required to respond as "mental health professionals" - which we are not - and at the same time be unreasonably burdened from using our **lawful** authority and force - **the unique and crucial skills we bring to the crisis** - in order to protect ourselves and the public.

14. The danger DOJ created when it demanded a new UF policy - disregarding any input from or the experience of patrol officers, especially in Seattle, and without regard for the longstanding rule of law or the appropriate role of the police - is the most serious threat to officer and public safety faced by the City in years, and, if not immediately rectified, will negatively impact the City for decades to come.

## IV. FACTUAL BACKGROUND

15. On December 17, 2013, Judge Robart, United States District Court Judge for the Western District of Washington at Seattle, issued an order approving an alleged "Consensus Use of Force Policy" (UF Policy) to govern SPD.  The court approved the policy as appropriate "for the present circumstances."  Judge Robart indicated that his role was to insure that the UF Policy was constitutional.  However, his cursory, one-and-one-half page order, contains no substantive analysis of the UF Policy or its constitutionality, and, in fact, statements in the opinion contradict well-established case law on how police officers are supposed to make determinations regarding the lawfulness and reasonableness of their actions. The UF Policy went into effect on January 1, 2014.

16. The "circumstances" referred to by Judge Robart include an investigation opened in March, 2011 by Defendant Thomas E. Perez, former Assistant Attorney General (AAG) of the Civil Rights Division of DOJ regarding whether or not SPD officers deprived individuals of their

constitutional rights by patterns and practices of discriminatory policing or excessive use of force. After its investigation, **DOJ was unable to make any findings of discriminatory policing**. However, DOJ issued findings (Findings Letter), including that when SPD patrol officers use force "they do so in an unconstitutional manner nearly 20% of the time." Subsequently in July 2012, a Settlement Agreement and Memorandum of Understanding (Consent Agreement) was entered into between the United States, SPD and the City. In the Consent Agreement, SPD and the City specifically **"dispute[d] the alleged patterns or practices of excessive force alleged in DOJ's report."** Nevertheless, they agreed to develop a new UF policy consistent with the constitutional requirements of *Graham v. Connor.* The Consent Agreement also provided that the parties would select a federal monitor to oversee implementation of the Consent Agreement. Defendant Merrick Bobb (Monitor) is the monitor selected by the parties. The Monitor publicizes his work on a website called the "Website of the Seattle Police Monitor," and his salary is paid by the City. The City to date has paid the Monitor and his staff (Monitoring Team) over $700,000.00. On November 27, 2013 the Monitor submitted the UF Policy approved by Judge Robart, with an accompanying Memorandum to the Court (UF Memorandum), alleging that the policy met the requirements of the Consent Decree.

17. Plaintiffs are primarily SPD patrol officers, and are the individuals most significantly and immediately affected by the new UF Policy. We are also the individuals with the most knowledge, training and experience regarding the UF situations facing patrol officers in Seattle. Moreover, many SPD patrol officers are established and recognized experts in use of force techniques, practices and standards.   Nevertheless, no SPD officers concurrently engaged in street policing duties were involved in the development of the UF Policy. DOJ and the monitor

choose instead, inexplicably, to consult the "rank-and-file in Los Angeles" to determine if the new policies "compromise[d] the safety of Seattle police officers and the public they serve."

18. In the very last days of the process, select Plaintiffs were invited to submit comments through the Seattle Police Officers' Guild (SPOG) and a departmental website called, Idea Scale. However, it soon became clear that they were solicited without any intention of affecting decisions already made by the Monitor and DOJ. Nevertheless, Plaintiffs provided a thorough review of the draft and identified how and where the draft policy conflicted with use of force best practices, the realities facing patrol officers on the streets of Seattle, and the protections afforded officers under the Second, Fourth and Fourteenth Amendments. These concerns were ignored. Plaintiffs again attempted to communicate their concerns to those involved in the process, before the draft became a final policy. Plaintiffs were told, in effect: "This is what DOJ and the Monitor are telling SPD to do regardless of whether or not it makes good sense or is good law. A federal judge has approved it. There's nothing SPD can do about it. It's a 'done deal.'"

19. The Monitor's UF Memorandum claims that the UF Policy represents a 'consensus' and 'unified voice.' This is inaccurate to the point of falsification. As almost every other statement in the UF Memorandum acknowledges, there has been, and Plaintiffs allege continues to be, a profound lack of consensus around the UF Policy. As is made clear above, despite Plaintiffs' vital role in the implementation of, and our significant impact from, the UF Policy, we were not even a party to the supposed 'contentious' and 'exhausting' negotiations the Monitor claims led to the final consensus on the new UF policy. Patrol officers were never meaningfully consulted during the process, and our Guild, though allegedly "consulted" by the Monitor, was not a party to, or at the table for, official decisions regarding significant, fundamental rights and interests of its

members. Plaintiffs contend that any appearance of 'consensus' asserted by the Monitor is simply due to the fact that he ran roughshod over any criticism and concerns, and that the various involved parties simply gave up. This reality is reflected in the tone of the Monitor's semiannual reports, which are self-serving, combative, and bullying. It is now clear that the Monitor and DOJ all along intended to use SPD and the City as a test-case to re-write longstanding constitutional law and principles - and to undermine reasonable police practices based on these principles - with which they disagree.

20. Defendant, Eric H. Holder, Jr., is the AG of the United States, and it was on his behalf the Consent Agreement was signed by Defendant Perez and Defendant Jenny S. Durkan, US Attorney, Western District of Washington. Defendants Perez, Durkan and Defendant, Jonathan Smith, Chief of Special Litigation for DOJ worked closely with the Mayor's office to develop the Consent Agreement and the subsequent UF Policy, as did other members of the Special Litigation Section, including Defendants Emily Gunston and Timothy Mygatt. DOJ continues to be involved in the implementation of, and training under, the new policy. Defendant Jocelyn Samuels is the current Acting AAG for Civil Rights.

21. Defendant Michael McGinn is the former Mayor of Seattle, and Defendant Peter Holmes is the Seattle City Attorney, each of whom signed the Consent Agreement on behalf of the City. Defendant Edward B. Murray is the newly elected Mayor of Seattle under whose administration the UF Policy will be implemented. John Diaz was the Chief of Police at the time the Consent Agreement was entered into and the UF Policy was being developed. Defendant James Pugel was Interim Chief of Police while the UF Policy was being developed and at the time it was submitted to the Court.

# V. CONSTITUTIONAL CLAIMS

### A. Plaintiffs Have the Right to Self-Defense and Defense of Others Under the Second and Fourth Amendments and These Rights are Violated by the UF Policy.

1. When a police officer is confronted with threatening behavior, he or she has the fundamental, individual right of self-defense under the Second Amendment, consistent with every other citizen, to protect himself or herself, and others, from apparent and immediate harm.  As the Court has long recognized, the rules that define and determine self-defense are of universal application and are not affected by the character of a person's employment. Indeed, where employees have a duty to protect others, their right to defend themselves and others is arguably enhanced. In many ways, these rights closely overlap patrol officers' rights to use force under the Fourth Amendment, especially when defending themselves against suspects who pose an immediate threat to their safety or the safety of others.

2. However, distinct from the Fourth Amendment standard of 'objective reasonableness' is a long tradition of self-defense law that establishes a 'reasonable belief' standard. As such, there need only be 'reasonable grounds' for a person's belief that he or she is in imminent or immediate danger at the time of the acts in self-defense or defense of others.  Like objective reasonableness, the reasonable belief standard does not rest on the 'actual facts' of the situation, but rather on the 'apparent danger' perceived by the individual acting in defense of self or others.  Moreover, under the Second Amendment, the more serious the apparent danger perceived at the moment of self-defense or defense of others, the less detached or 'objective' the test of reasonableness has to be.

3. As discussed in detail in section VI.A below, the UF Policy, particularly the deadly force provision, violates Plaintiffs' rights and protections secured by theses standards under the

Second Amendment.  We state again, we are not seeking unfettered, unregulated permission to use force.  Our complaint is against the situation created by the UF Policy whereby sworn patrol officers are placed at unreasonable risk and disadvantage *vis-a-vis* suspects who threaten deadly harm or serious bodily injury.  Moreover officers are placed at a disadvantage in protecting themselves and the public compared to ordinary citizens, notwithstanding that  officers are given both the trust and responsibility to respond to and protect the public from danger.

**B.  Police Officers have Constitutional Protections under the Fourth Amendment, Distinct from the Interests of the Government, and/or the Rights of the Citizens and These Protections are Unreasonably Burdened by the UF Policy.**

1. The Supreme Court's Fourth Amendment jurisprudence - the core legal parameters that guide police interactions with persons engaged, or suspected of engagement, in criminal activity - contains clear and longstanding standards and principles regarding seizures by police officers. In fact, force is itself a seizure, and therefore subject to the same requirements for reasonable suspicion and probable cause as all other seizures.   The Fourth Amendment balances three distinct sets of interests when considering the reasonableness of an officer's decision to make a seizure:  (1) the private citizen's interests against unreasonable intrusion by the government; (2) the government's interest in detecting, investigating, and preventing crime; and (3) the "more immediate interest of the police officer" in protecting himself or herself and others from danger, because it is unreasonable to require that police officers take unnecessary risks in the performance of their duties.  Thus, the Fourth Amendment gives patrol officers distinct constitutional protection against being required to take unnecessary risks with their lives and safety.

2. Plaintiffs want to be clearly understood.  We know our job puts us in danger.  We willingly accept these risks in large part because our job also allows us the privilege to serve and protect

the innocent.  Obviously, we are not arguing that the Constitution grants us the right to dictate, to our employers, all the terms of a UF Policy. We also are not arguing that the Constitution requires our employer (SPD and the City) to do the impossible, e.g., control suspects' dangerous behavior, or keep us at all times safe.  We are arguing that the Constitution provides us certain rights and protections:  Our employer cannot make policy decisions and impose policy requirements that put us at unnecessary and, therefore, unreasonable risk when confronting threatening or resisting suspects, and which require us to take unnecessary and, therefore, unreasonable risks with our safety and the safety of the public we serve.  Longstanding Fourth Amendment case law has worked a careful balance among these rights and interests by examining the objective reasonableness of the officers' conduct based on the totality of the circumstances perceived by that officer at the time force is used, particularly the immediacy of the threat to the safety of the officers and others.  The UF Policy consistently undermines that balance, ignoring and discounting the threat presented by suspects, unreasonably restricting and burdening officers' ability to take necessary actions, and requiring officers to take unreasonable risks.  In doing so, the UF Policy attempts to re-define as 'excessive', force that is reasonable in light of the threat to officers' safety at the time, and thus undermines the protections afforded police officers under the Fourth Amendment's careful scheme.

### C. Patrol Officers Are Not Required to Forfeit Their Rights In Order to Obtain, Retain, or Perform Their Job Under the Fourth and Second Amendments.

1.  DOJ, the City and SPD leadership are under the mistaken belief that they can unreasonably restrict and burden, and subsequently punish Plaintiffs, for using reasonable force allowed by the Second and Fourth Amendments, in a confrontation between the police and suspects.  Plaintiffs' constitutional protections against being required to take unreasonable risks, however, are

incorporated, and apply to the States and municipalities, such as the City and SPD, under the Fourteenth Amendment. As applies against all Defendants, the Court holds that public employees do not lose Fourth Amendment rights when they work for the government. Nor are they relegated to watered-down versions of constitutional protections. Moreover, the Court specifically holds that constitutional protections against unreasonable search or seizures do not disappear because the government employer has the right to make reasonable intrusions or impositions.

2. Here Plaintiffs are granted protection under the Second and Fourth Amendments not to be required to take unreasonable risk with their safety. It is the unreasonable risk itself that is the constitutional injury, and it is the policy and practices demanded by DOJ and implemented by the City and SPD that have created this risk. The Fourth Amendment authorizes Plaintiffs to take reasonable action in response to threatening and dangerous conduct by suspects. While suspects may cause bodily harm and even death to Plaintiffs, it is the intentional conduct of government actors that expressly restricts and burdens police officers' authority to take the reasonable actions necessary to protect themselves and others from that danger. Thus it is the conduct of government actors that have caused unreasonable risk and the constitutional violation under § 1983.

   **D. DOJ's Factual Justification for the Alleged Constitutional Violations by SPD Patrol Officers is Speculative, has been Discredited, and therefore cannot Support the Remedy Imposed by DOJ.**

3. The factual analysis on which DOJ bases its assertion that there existed a pattern and practice of unconstitutional, excessive force used by SPD patrol officers has been discredited and is incorrect. DOJ repeatedly refused to provide the City, SPD or the public with the data, methods, or analysis it used to reach its conclusion that 20% of UF situations utilized excessive force. The

little information DOJ did provide indicates that its key finding comes from an extrapolation from a random sample of UF reports. It is therefore nothing more than speculation. An independent analysis by researchers under the supervision of Matthew Hickman, a Professor at Seattle University, and a former statistician for DOJ itself, examined - in totality - every single UF report during the time period that was considered, and extrapolated from, by DOJ. In stark contrast to DOJ's unsupported assertion, the Hickman study found that only 3.5% of the cases could be characterized as even "potentially" excessive.

4.  In addition, DOJ's finding regarding the prevalence of excessive force directly conflicts with other key findings by DOJ such as: the "great majority" of Seattle's police officers do not use excessive force; the pattern of excessive force exists only for a very small "subset" of officers; that supervisory oversight should focus only on the "very small number" of officers who use force frequently; and that the alleged 20 officers whom DOJ is concerned about represent only 4% of SPD officers that used force in 2010. DOJ goes so far as to concede that if there is anything, there is only an "appearance," not the reality, of a wide-spread problem, thus refuting their own conclusions.

### E. DOJ, SPD, and the City have attempted to Fundamentally Alter the Terms and Conditions of Plaintiffs' Employment without a Meaningful Opportunity to be heard in Violation of the Due Process Clause of the Fifth and Fourteenth Amendments.

1.  The Due Process Clause of the Fifth Amendment prohibits a federal agency, such as DOJ, from depriving individuals of life, liberty or property without the due process of law. Similarly, the due process clause of the Fourteenth Amendment prohibits state actors from doing the same. Clearly such rights are at stake here. Plaintiffs believe that the UF Policy requires them to take unnecessary and therefore constitutionally unreasonable risks with their safety in the

performance of their duties, including subjecting them to unnecessary risks of death and serious bodily injury. There can be no argument that such deprivation requires due process. Furthermore, even though Plaintiffs recognize that we assume a certain level of risk by accepting employment as police officers, we do not accept that we must forfeit our constitutional protections by doing so, nor, therefore, that we can be coerced into assuming unnecessary, unreasonable risks. Moreover, Plaintiffs believe we will face unreasonable disciplinary actions, lawsuits, loss of employment, and the inability to obtain police employment in other jurisdictions, if and when we are accused of violating the new UF Policy, even though our actions were reasonable under the law. Such property interests at issue have been established by statutes, regulations, SPD procedures, and collective bargaining agreements governing the employment relationship between police officers and the City.

2. Notwithstanding these significant and serious liberty and property interests, DOJ has imposed, and the City and SPD have acquiesced, in the fundamental rewriting of nearly universal, longstanding, constitutionally grounded rules of acceptable, i.e. reasonable, police conduct. They did so without providing Plaintiffs any meaningful opportunity to be heard, even though it is our safety and livelihood that is most significantly and immediately affected by the policy changes. They did so without meaningful consultation with or involvement from SPOG. They did so notwithstanding that many SPD patrol officers are recognized experts in the field of use of force standards and techniques. They ignored Plaintiffs' experience and expertise, even as the Monitor inexplicably consulted with the "rank and file" police officers in a different state, a different type of city, in a different region of the country. This is particularly troubling when the constitutional standard at issue - whether the police officers' conduct was objectively reasonable

- depends on an examination of the specific knowledge, experience, training and circumstances facing those officers.

3. A key condition of Plaintiffs' employment is the availability of qualified immunity when officers are sued based on claims that we used excessive force.  This is an essential condition, as patrol officers are required to respond to dangerous, tense, and uncertain circumstances on a daily basis, and the public wants us to do so with confidence in order to protect them.  Qualified immunity recognizes that to reasonably ask this of police officers, they must be protected from the fear of unfair lawsuits, particularly in the hazy border between excessive and acceptable force.  Qualified immunity also recognizes that police officers can act reasonably under the law even when they are mistaken as to the facts and circumstances at the time, or how the law will apply to those facts. As discussed below, the UF Policy, by contrast, legislates and requires perfect and exact responses by police in their encounters with dangerous and threatening suspects.  Such an approach undermines the longstanding totality of the circumstances standard by which officers' conduct should be assessed, and thus throws into question patrol officers' immunity - a significant right and essential condition of our employment - without any meaningful opportunity to be heard.

## VI. SPECIFIC CONSTITUTIONAL VIOLATIONS UNDER TITLE 8 (UF Policy)

### A. The Deadly Force Provisions of the UF Policy Violate Plaintiffs' (Officers') Constitutional Rights by Basing the Reasonableness of the Decision to Use Deadly Force on the 'Actual' Facts and Circumstances, instead of those 'Apparent' to the Officer at the Moment Deadly Force is Used.

1. The new UF provisions, are found in Title 8 of the Seattle Police Manual, a copy of which can be found on the Monitor's web site: www.seattlemonitor.com.  Under Sec. 8.100.5 of the UF Policy, deadly force may be used only, and without exception, in circumstances where

SPD Officers' § 1983 Complaint

the threat of death or serious physical injury to the officer or others **IS** imminent. The UF Policy then imposes the following conditions on the objective reasonableness standard for determining whether or not an imminent danger is **PRESENT**: The suspect **IS** acting in a manner or threatening to cause death or serious physical injury to the officer; **AND** the suspect, in fact, **HAS** the "means or instrumentalities;" **AND HAS** the "opportunity and ability" to do so. These requirements are completely contrary to the overwhelming history of constitutional precedent that protect a police officer, or citizen, if he or she acts on a mistaken belief regarding the 'actual' facts as long as the officer or citizen had a reasonable belief in, or acted in an objectively reasonable manner in the face of the 'apparent' danger presented by the suspect at the time. When patrol officers are categorically restricted in their ability to respond to reasonably perceived threats of death or serious physical injury, the protection and rights granted them by the constitutional principles of self-defense and defense of others are burdened to the point of destruction in violation of the Second and Fourth Amendments.

2. Moreover, under the core provision authorizing force, Sec. 8.100, patrol officers are prohibited, without exception, from using physical force except when "no reasonably effective alternative appears to exist." Jurisprudence under the Second and Fourth Amendments, however, has consistently made clear that when there is a reasonable belief regarding a threat of death, or serious physical injury, or where the officer's conduct was objectively reasonable in light of the circumstances, the Constitution protects him or her for actions taken in self-defense or defense of others regardless of whether or not there existed less intrusive means, or alternatives to self-defense or defense of others, such as inflicting a less serious injury to, retreating from, or containing, or negotiating with the suspect.

**B. The UF Policy is Unconstitutional Because Throughout it Forces Patrol Officers to Use Less Force Than is Reasonably Required by the Threat, thus Requiring Officers to Take Unnecessary Risks in the Performance of Their Duties.**

1. Under the Second, Fourth and Fourteenth Amendments, **the appearance of an immediate threat justifies an immediate response with reasonable force.** Anything else, requires officers to take unnecessary and unreasonable risks in the performance of their duties, and the Constitution provides them protection from such risks.

2. Nevertheless, the core provision authorizing force under the UF Policy, Sec. 8.100, categorically prohibits an officer from using physical force that is reasonable unless, in addition to being reasonable, the force also is necessary - which means the officer has first considered **all** apparent "reasonably effective alternatives." Yet, even the Ninth Circuit has expressly rejected that an officer must first avail himself or herself of all the less, or the least, intrusive alternatives available to him or her, under the reasonableness standard. The Circuit found that such a requirement would place unreasonable burdens on police officers under the Constitution by demanding superhuman judgment. In turn this would make them hesitate and be tentative; it would deter them from protecting themselves and others; and it would invite endless, unreasonable second-guessing.

3. The policy also makes a wholly new requirement nowhere found in constitutional case law that force must be "proportional to the threat" (Sec. 8.100.1). This is an extra-constitutional requirement and serves only to add layers of complexity and precision to a standard that the Court demands, by contrast, be simple and flexible.

4. Sec. 8.100.1 also states that: "proportional force does not require officers to use the same type or amount of force as the subject." Defendants are likely to argue that this provision allows an officer to retain discretion to use the level of force he or she judges appropriate to

the circumstances, even force greater than that threatened by the suspect.  In fact, however, any such deference to officers' judgment is consistently and overwhelmingly contradicted by operation of other parts of the policy.  For example, officer discretion is overridden by the policy's requirement throughout that use of force "shall" in all cases precisely be "only the degree... necessary."  It is also overridden by the policy's explicitly restrictions on officers' rights to use certain levels and types of force - even in immediately threatening situations - unless a variety of other factors, conditions, qualifiers are or are not present, and not before officers have engaged in the time-consuming mental gymnastics necessary to satisfy all the complex and contradictory requirements of the new UF Policy.  The real effect of the policy is to keep patrol officers *constantly* second-guessing their actions, meanwhile remaining at a dangerous force deficit throughout encounters with threatening suspects.  Obviously, this puts Plaintiffs' safety at unreasonable risk whenever we go out on call.  It also means that no matter what we do, someone can, after-the-fact, point to some  provision of the policy and say we did it wrong.  This puts our livelihood at unreasonable risk.

5.   Sec.8.200, categorically and without exception, prohibits officers from using less-lethal tools against vaguely defined, newly protected classes of suspects (visibly pregnant, elderly, pre-adolescent, visibly frail, or known or suspected to be disabled) absent active aggression, unless deadly force is the only other available option.  These five categories are sufficiently broad, subjective and vague so as to encompass a broad swath of individuals, and to invite significant error in application and improper second-guessing.   Moreover, by operation of this rule, an officer cannot use reasonable and effective force tools or techniques (i.e., tools and techniques specifically intended to "disrupt subject's threatening behavior" with*out* the probability of death or serious physical injury) until deadly force is justified.  **This makes no**

**sense as a matter of public policy.**  In the apparent attempt to protect certain groups of individuals, the UF Policy actually increases the likelihood that such persons will get killed or seriously injured in encounters with the police - a clear violation of those suspects' rights. It also unreasonably burdens the protections granted police officers under the Fourth Amendment, because it restricts officers from responding with the force reasonably required by the circumstances at and from the moment they arrive on the scene.

6.  Sec. 8.200.5 also categorically restricts an officer from using these less-lethal tools and techniques against suspects in another nine (9) sets of circumstances absent active aggression.  This means the suspect can be actually resisting, or actively noncompliant with officer's commands - a potential indication of an intent to do harm to the officer -yet the officer cannot, without exception, respond with less-lethal techniques before considering every "other fashion" of reasonable response (e.g. all other alternatives).

7.  The UF Policy consistently requires officers first to consider alternatives to force (e.g., Sec. 8.000.2 "officers **will** de-escalate conflict without using physical force;" Sec. 8.100.3 "officers **shall** use de-escalation tactics").  It attempts to qualify these provisions in order to make them *seem* reasonable and/or constitutional.  Here, for example, stating that de-escalation is required only "when time and safety permit..."  Such qualifiers are pretty, but useless, window dressing at best.  At worst, they add complexity to a policy that is already unwieldy and unworkable to the point of putting officers' lives at risk.  Moreover, they serve to disguise how the policy, *taken together as a whole*, is out and out wrong.  Specifically, officers are told to delay only "when time and safety permit," - this sounds reasonable - but in the very same provision we are required to do the exact opposite and take unreasonable risk.  This is because we are required by the provision to delay and not use force even though

(1) **our safety has already been compromised** by the subject's lack of compliance (i.e., under Sec. 8.100.3 officers consider not if the subject is non-complaint, but the reasons for the suspect's "lack of compliance"); and (2) **there is an immediate threat** ("mitigating the **immediacy** of the threat" is the assumed situation when these rules apply). Bottom line again, the UF Policy consistently throws roadblocks in the way of officers lawful and reasonable use of force. Doing so subjects us to unreasonable risks to our safety, and to the constant, unreasonable threat that we will be sanctioned for performing our job in anything less than a perfect (impossible!) manner under the policy.

8. The UF Policy operates under a mistaken and dangerous assumption that threatening situations always move in a linear, predictable direction. It assumes that de-escalation will inevitably result in a reduction of the use of force, because additional time and space "promote more rational decision-making" by suspects, and because it is better to have more time for "more officers or specialty units" to respond to the scene. The policy direction comes directly from DOJ who criticized SPD's training of its officers to quickly "command and control" situations, proposing instead that it require its officers to engage in a "fair fight" with suspects.

9. The constitutional protections and rights afforded police officers, however, certainly do not rely on an assumption that suspected criminals will fight fair or behave rationally. Moreover, such an understanding by DOJ is totally at odds with current research, as well as with officers' first-hand professional experience, which demonstrates that using decisive force early in response to an immediate threat is often what keeps the situation from ending in necessarily greater uses of force, or tragedy. The UF Policy is therefore also at odds with the Fourth Amendment's core principle, discussed further below, that the reasonableness of a UF

be judged **only, and in every case, under the totality of the circumstances, from the perspective of the officer on the scene at the time force is used**. A UF Policy which, as in all the sections discussed above, ties a Plaintiff's hands without regard for the specific circumstances facing the officer at the moment and without any place for consideration of the knowledge, training, or experience of the officer, violates this fundamental Fourth Amendment principle.

**C. The UF Policy is Unconstitutional Because it Establishes Separate Rules for Certain Categories of Suspects, and Requires Police Officers to Act as Medical and Mental Health Professionals Beyond the Reasonable Scope of their Duties and Professional Qualifications.**

1.  The Fourth Amendment specifically rejects the application of separate tracks or categorical rules when considering the mentally ill, or any other category of suspect, to determine reasonableness when that suspect is behaving in a threatening or resistant manner. Nevertheless, (1) the de-escalation provisions unconstitutionally mandate that an officer's UF decision take into account the suspect's mental and physical state, even where the suspect is actively non-compliant; and (2) the Tool Specific provisions unconstitutionally tie an officer's hands in cases involving five new categories of actively threatening suspects based on physical and/or mental conditions. These parts of the UF Policy seem driven directly by DOJ's goal, **in all cases**, of eliminating use of force against people who are having a mental health crisis or who are under the influence of drugs or alcohol; in other words, defining as excessive any force used against such persons. This is based on its mistaken notion that "assessing the appropriate force in light of a subject's mental state is not just smart policing, it is required." DOJ is fundamentally wrong. Courts hold just the opposite. The crucial factor in deciding whether or not there was excessive force is the nature and immediacy of

the threat.  Thus, the Constitution does not allow second-guessing of an officer's UF decision, even though the officer failed to diagnose mental illness, because requiring otherwise is impractical and dangerous.  **This cannot be stated too strongly: a threat of harm, is a threat of harm regardless of what mental or physical conditions cause the threat!**

2. Moreover, considering even just one of the factors - whether or not the suspect is experiencing a drug interaction - highlights how extremely problematic these requirements are.  Police officers are not medical or mental health professionals.  It can take doctors and mental health professionals months or years to figure out a patient's diagnosis, drug interactions, and appropriate means of communication, therapy, and treatment.  Yet the UF Policy requires police officers, as a precursor to using reasonable force, to make on-the-spot mental health status evaluations and diagnoses under circumstances that will be, by definition (given the suspect's non-compliance), threatening, volatile, and potentially dangerous or deadly.

3. Police are not called to the scene to be therapists or mediators.  They are called by family members, potential victims, medical and mental health professionals, and others **who are afraid for their safety or the safety of others**, precisely because police officers have the clear authority to use decisive force as soon as it is required.  (In fact, in Seattle, fire, medical, and/or mental health personnel will not respond to the scene to assist or involuntarily commit mentally ill patients until patrol officers arrive if there is any potential for violence.)  A UF policy that disregards the facts and reality of the patrol officer's role when dealing with threatening or dangerous behavior is totally at odds with a constitutional

scheme that protects and gives deference to the men and women who willingly undertake that role.

**D. The UF Policy's Imposition of Categorical Rules Related to the Mentally Ill and Other Categories of Suspects Violates the Fourth Amendment Requirement that Use of Force be Judged Based on the Experience, Knowledge and Training of the Patrol Officer on the Scene.**

1. The UF Policy's categorical, special treatment of mentally ill suspects or those impaired by drug use or other conditions, flies in the face of the knowledge, training, and experience of working patrol officers who interact with these individuals on a daily and weekly basis. Consideration of, and deference to, such knowledge, training and experience is mandated by the Fourth Amendment.  Throughout its Findings Letter, DOJ consistently identified erratic and non-compliant behavior by suspects as deserving of "special," gentle handling. However, patrol officers and experts in the field of policing across the country, understand that the exact behavior DOJ identifies as benign (yelling expletives at oneself, staring into space, bulging eyes, sweating, balled fists, disregarding or refusing officer commands, taking off pieces of clothing) can be, and often is in fact, evidence of Excited Delirium and/or "boiling point," pre-attack indicators, i.e. evidence that a suspect's behavior is not only not benign, but likely to become violent and rapidly escalate his or her attack on officers or the public.

2. Research also shows a strong correlation between mental illness and the use and abuse of drugs.  It shows that drug abuse, in turn, is strongly correlated with violent behavior and that drug abusers do not respond to usual norms of behavior as suggested by DOJ's and SPD's de-escalation requirements.   What is relevant is what Plaintiffs have learned from their years of training and experience on patrol. The Fourth Amendment does not permit judges, or in this

case DOJ and its Monitor, to look back in perfect hindsight, from the safety of their chambers or offices, to second-guess what patrol officers actually faced at the moment and know from real experience on the streets.  Nor does it permit, as has happened here, a UF Policy to be based on the experience of officers in another jurisdiction over a thousand miles away.  The Monitor absurdly consulted the "rank-in-file in Los Angeles" to determine if the UF Policy would keep Seattle patrol officers safe.  Moreover, it is clear from the background of the so-called police experts on the Monitoring Team, that it has been years since they, if ever, made actual UF decisions in the line of duty.

3.   It is too easy for DOJ attorneys and consultants - or even police officers who spend time at desks writing policy, performing administrative functions, or even training officers in the practice hall - to forget the reality facing officers on the street.   It is too easy for those not doing the job, to discount how frequently Plaintiffs are called, how threatening it feels, and how objectively dangerous it is, for example, to respond to a 911 call and find a schizophrenic man who has stopped taking his medications, threatening to hurt family members, himself, innocent bystanders, or the officers, and who has ready access to weapons or other objects that can be easily used with serious or deadly effect.  The Constitution, by contrast, offers Plaintiffs protection for precisely these reasons, giving deference to the reasonable judgments and actions of patrol officers facing just such circumstances.

**E. The UF Policy is Unduly Burdensome and Confusing, Forcing Officers to Consider so Many Factors, in the Heat of the Moment, that Timely and Reasonable Judgments in the Face of Threats Becomes Virtually Impossible, Requiring Officers to Take Unnecessary Risks in the Performance of Their Duties.**

1.   Under the Fourth Amendment cases leading up to *Graham*, as well as its progeny, the right of the officer to make arrests and investigatory stops necessarily carries with it the right to

use some degree of force, as long as its reasonable in inception and scope.  The standard for whether or not force is excessive is also clear and longstanding:  Were the officers' actions objectively reasonable in light of the facts and circumstances confronting them at the moment force was used?  The most important single factor in determining whether use of force is reasonable, and therefore whether the officer's conduct is protected by the Constitution, is whether or not the suspect posed an immediate threat to the safety of the officer or others.  This is because the safety of the officer and others is the critical issue.  Fourth Amendment jurisprudence recognizes that officers often enter unpredictable, threatening situations, and, under the stress of often extreme circumstances, must do their best to keep everyone safe and unharmed, while also being knowledgeable and responsive to the constitutional rights of all the parties involved, including those of the suspect.

2.   Given the difficulty of the task, the Constitution demands that the principles and process regarding UF decision-making, just like those for all seizures, must be fluid, flexible, practical, simple, clear, non-technical, and based on *common sense*, i.e. useful to the officer in his or her work on the street, even if not necessarily useful to legal technicians in the safety of their chambers and offices.  The principles, policies and practices must be ones that can be applied consistent with an officer's need to make split-second decisions, under an indefinite variety of situations and threats, in tense, dangerous, and rapidly unfolding circumstances.  DOJ found that SPD's previous UF policy was "vague."  Yet, the Court has expressly rejected such a concern.  The Court acknowledges that reasonable suspicion and probable cause as determined by the totality-of-the-circumstances standard can appear vague or elusive, but has repeatedly held that it is the **only** standard that can be practical and useful to officers in the field.

3. Standards are not useful, and therefore not constitutional, when they distort this approach by, for example, being overly specific, complicated, categorical, mechanical, or a neat set of rules, even if they purport to be helpful by giving officers an "easy to apply" legal test. Precise mechanical rules can **never** substitute for flexibility and experience, as there is nothing predictable, easy, or neat about what a patrol officer faces when he or she responds to a volatile call, which may require that force be used.  Reality simply does not lend itself to being divided up and pigeon-holed into neat, clearly defined and immediately discernible categories, according to precise bright-line, mechanistic rules.  Notwithstanding years of cases to this effect, the new UF Policy attempts precision and specificity.  Accordingly, we have ended up with a policy that complicates, confuses, and undermines how officers realistically can make these judgments and how those judgments will be analyzed and reviewed after-the-fact.

**a. The UF Policy is Overly Complicated.**

1. Contrary to this mandate for **simplicity and flexibility**, Judge Robart approved what he acknowledged is a **"comprehensive" and "specific" policy**.  Yet, on its face, a policy cannot be useful to patrol officers facing dangers and making split-second decisions, when that policy is over 60 pages long!  And requires an additional, new 50-page manual for SPD investigators to explain how to investigate UF under the new policy.

2. Consider the crucial Sec. 8.100 regarding when force is authorized.  The policy deceptively states the underlying law correctly: An officer uses only reasonable force "based on the totality of the circumstances known by the officer at the time of the use of force;"  it must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight;" and the assessment must "embody allowance for the fact that officers

are often forced to make split-second decisions--in circumstances that are tense, uncertain, and rapidly evolving." However, the UF Policy then operates to undermine **everything** it just stated. First, it promulgates a set of 12 separate, multi-layered, non-exclusive factors that must be considered by the officer to determine reasonableness. (*Graham* lists three.) It then requires officers also to apply two extra-constitutional requirements (necessity and proportionality) discussed in detail in Sec. B. 2. above. Next, the policy establishes five situations in which force is categorically prohibited (Sec. 8.100.2). In addition, the officer must consider seven factors related to suspects' mental and physical behavior that must be "balanced" in an officer's decision-making process. If the policy is not be an exercise in second-guessing, as it purports not to be, these 26 factors, requirements and situations all must be considered and evaluated, and the officer's response must be calibrated accordingly, in the "split-second" the officer has to make the decision whether or not to use force in the face of threatening behavior. This is an *impossible* task. It makes a mockery of the protections granted by the Fourth Amendment to police officers' reasonable judgments and actions in the heat of the moment.

3. Incredibly, these multi-layered and multi-factored analyses address only the initial question of whether or not force can be used. Under Sec. 8.000.3, the officer must then consider his or her prior conduct to determine the level of force he or she is permitted to use. Also under Sec. 8.200, the patrol officer has to assess whether or not a suspect falls into any of five categories before being permitted to use a certain level of force. After engaging in that fraught-with-potential-for-error assessment of suspects, the officer must also know and factor in, under Sec. 8.200- POL1-10, another 13 pages of detailed rules regarding ten specific tools and techniques, again, by definition, under tense, uncertain, and rapidly

evolving circumstance. *The UF Policy operates to defy reason, common sense, and the protections and rights given Plaintiffs under the Constitution.*

4.   The policy contains yet another complex, mechanical scheme related to the reporting and investigation of UF incidents. The new policy creates four categories of types of force (§ 8.050). In addition, it creates a four-part classification of types of injuries (§ 8.050). Finally, it creates detailed rules for ten specific force tools (§8.200-POL-1-10). Under § 8.300-POL-1, the policy creates a complex overlay that combines, type of force, type of injury, and type of force tool, to create different categories of reporting requirements for officers and screening requirement for supervisors. As the the policy also requires throughout that officers justify each and every separate force application, see e.g., §§ 8.200-POL-1.11; 8.200-POL-3.9; 8.200-POL-5.6; 8.200-POL-6.5, officers must somehow ensure they are cognizant of this complex system even as they make UF decisions in the split-second required in the face of suspects' threatening behavior.

5.   Moreover, the factors that the officer uses to justify, and that supervisors, commanders, and citizens use to review, the use of force **must be the same** factors the officer uses to make his force judgments and decisions on the scene.  If factors are too complicated and contradictory to facilitate reasonable decisions in the heat of the moment, then they **cannot** be used, after-the-fact, to invalidate the officer's judgment and conduct. This is constitutionally unreasonable, though clearly what is mandated by the reporting and review provisions of the policy.

### b. The UF Policy Applies Segmented and Deconstructive Rules to Officers' Judgments in Violation of the Fourth (and Second) Amendments.

1. The UF Policy violates the protections granted patrol offers under the Fourth Amendment by requiring both analysis of the officer's prior conduct, and a *post-hoc*, point-by-point critique of the incident.  These work together to invalidate the totality standard's focus on "the circumstances confronting the officer" ... "at the moment" force was used.  For example, under Sec. 8.000.3, patrol officers are warned that "their conduct prior to the use of force," including the "display of a weapon," can be a factor in determining whether or not the subsequent use of force was necessary (again ignoring that the constitutional test is "reasonableness").  This expressly contradicts the Ninth Circuit and other circuits holding that conduct preceding the seizure, including alleged 'tactical errors' (as determined, by definition, only in 20/20 hindsight) is irrelevant to the Fourth Amendment analysis of reasonableness.

2. Moreover, it makes no sense to the reality of the officer's experience.  Officers routinely have their firearms out and at the ready when, for example, they search and clear a building, or approach suspects during high-risk vehicle stops.  In such cases, the threat is the uncertainty, and officers need to be armed and ready, because they are **always** behind the reactionary curve of a potential suspect who has decided to shoot, stab, slash, or smash as a means of resistance or escape.  The fact that the officer displaying his gun may have caused a suspect to respond by pulling out his gun is absolutely irrelevant to what happens next.  Just like any other citizen, an officer facing a threat of death or serious physical injury may reasonably respond to that threat with deadly force.  The new UF Policy creates questions and

uncertainties as to the validity of long-standing and time-tested police practices and protocols, which are intended to protect officers from unnecessary risks.

3.   Under Sec. 800.3, officers are also required to "continually assess the situation" and "modulate the use-of-force appropriately."  In addition, throughout Sec. 8.200-POL-1-10, officers are required to "justify" and "report" each separate use of a less lethal device during a single incident, including that "each subsequent application of force is a separate application of force that must be individually justified."  Under Sec. 8.300, officers are required to document, and supervisors are required to review, in all but *de minimis* force, each and every blow or application of force.  (Sec. 8.300-POL-1, 8.300-POL-1.1) We know from DOJ's findings in its similar review of use of force by the Portland Police Bureau, that DOJ explicitly advocates a "segmented approach" to use of force claims, whereby supervisors consider, after-the-fact, "each point when an officer made a decision that may have an effect on subsequent events" - the ostensible point here allegedly being to allow "intensive" reviews of the reasonableness of the officer's conduct in order to identify "flawed tactical decisions."

4.   It should be noted that, by DOJ's own words noted above, it is admitting that its approach to UF review is expressly designed to lead to unconstitutional second-guessing, 20/20 hindsight critiques, Monday Morning Quarterbacking, or whatever other description one prefers to employ.  However, such a "divide and conquer," reductionist analysis has been expressly and repeatedly rejected by the Court.  The Fourth Amendment looks at UF as a continuous event until the threat is decisively stopped or contained.  Thus, the officer's judgment and actions must be assessed cumulatively, i.e., as a whole picture taken together, without imposing a sequencing of distinct events in order to poke holes and find flaws, or to explain away each

element in an officer's cumulative judgment as innocent and thus, not relevant, in and by itself. Such an unconstitutional method has no other aim than *post hoc* analysis and judgment in an effort to undermine the protection and deference granted officers' judgments by the Constitution.

### c. The UF Policy Improperly Applies Precise and Mechanical Definitions to the Test of Reasonableness.

1.  Fourth Amendment case law is quite clear. The test of reasonableness is not capable of precise definition or mechanical application. In violation of this tenet, the UF Policy is littered with overly precise definitions and mechanical requirements. For example, throughout the UF Policy, officers "shall use **only the degree** of force..." (e.g., 8.000.4). This type of precision and quantification is impossible and not at all demanded by the reasonableness standard. It is in fact explicitly rejected. Under Sec. 8.100.6, the UF Policy establishes an inclusive and rigid 3-part rule for fleeing felons, including, a verbal warning requirement, notwithstanding that the Court has specifically rejected just such rigid rule(s). In these circumstances, as in all cases of force, the officer's conduct must be evaluated based on one flexible standard: was it objectively reasonable in light of the circumstances as they appeared to the officer at the time of the incident? Any other mechanical test undermines the protections granted police officers not to take unnecessary and therefore unreasonable risks with their safety or the safety of others.

2.  In addition, Sec. 8.050 divides force into qualitatively separate and distinct types. The categorical force type is then applied mechanically for purposes of both an officer's decision, and SPD's and the City's after-the-fact analysis and review, to determine whether or not the officer should be disciplined and/or criminally charged for the UF. Such a mechanical

scheme defining and categorizing levels of force smacks of an attempt to impose a UF continuum on SPD. Requiring officers to pigeon-hole force types before, during, and after their decision to use force, complicates and hampers their ability to respond to the particular circumstances they face. It also implies that mechanical decisions can always be made regarding when and what force is reasonably required to meet a suspect's threatening behavior and/or resistance. Plaintiffs know from experience this is never true. Not surprisingly, continuums and mechanical schemes have been discredited by law enforcement experts, even those in other departments of the DOJ itself, as unconstitutional and promoting dangerous, ineffective policing. Even with so-called 'deadly force', the Court has eliminated the notion that there exists a magical on/off switch for determining the type of force used by an officer. The **only** question is: were the officer's actions reasonable in the particular circumstances as they appeared at the time force was used.

## VII. HARM CAUSED AND RELIEF SOUGHT

### A. Plaintiffs Claims of Harm are Real, Significant, Immediate and Continuous.

1. The dangers and harm cited by Plaintiffs are real, not exaggerated or conjectural. The Constitution long holds that imposing any standard on police judgment and conduct, other then the totality of the circumstances standard, creates unnecessary and therefore unreasonable risks to Plaintiffs' safety and the safety of the public. **This unnecessary and unreasonable risk is itself the injury.** Plaintiffs identify the plethora of ways in which the UF Policy violates the totality of the circumstances standard, and thus creates unnecessary risks to their safety each time Plaintiffs go out on a call. If further evidence of the unnecessary risks created by the policy is useful, Plaintiffs will show numerous incidents

where patrol officers have hesitated or failed to use appropriate levels of force under the circumstances, including cases where officers have frozen, or retreated from suspects who threatened the officer with death or serious physical injury. In these cases the officer(s) and public were unnecessarily exposed to serious danger or death - *and in many cases officers have been injured* - due to the environment, practices, and policies created by the Defendants. Patrol officers will testify to greatly increased disregard, provocation, resistance, and threatening belligerence by suspects since the delay and avoidance policy and practices began to be imposed.   Instead of creating effective and constitutional policing in Seattle, DOJ has empowered its criminals to openly defy legitimate police authority, and made the police and public significantly less safe, by producing unconstitutional, ineffective policing.

2. Moreover, as DOJ consistently recognizes that there is a national crisis in the mental health system affecting, in particular, urban centers such as Seattle, and an inappropriately large part of the burden of this crisis falls on the police.  DOJ also acknowledges that Seattle has seen "horrific murders committed by mentally ill offenders," of both citizens and police officers. It acknowledges the 2009 unprovoked, unexpected murders of five on-duty, uniformed police officers in and around Seattle, and the wounding of a sixth officer.  It claims, unconvincingly, in light of the rest of its findings, "not [to have] underestimated the impact of these events on all police, and particularly on SPD officers."   In fact, the mental health crisis presents enormous and significant challenges and threats to Seattle police officers that puts our lives and the lives of innocent bystanders at risk when we cannot respond with reasonable force.

3. More generally, FBI's Uniform Crime Reports show, for example, since 2010 between 48 and 72 police officers were feloniously killed each year in the line of duty.  Perhaps more

significantly in each of those years, between 53,000 and 57,000 officers were assaulted by suspects - or 10 out of every 100 sworn officers - and on average about 27%, or almost one-third of these officers, sustained injuries as a result of the assault. The dangers to police safety are real and they are significant. Every 911 call has the potential to turn harmful or deadly.

### B. Plaintiffs' Harm Began Before the Final Policy Went Into Effect.

1.   While the actual UF Policy has only been in place since January 2014, the standards reflected in it have been imposed on SPD in practice, by DOJ, since it issued its Findings Letter on December 16, 2011, and quickly became the pattern and practice of what has been required of patrol officers since that time. Officers have already been, as we will continue to be, trained to "pause," hesitate, over-think, and under-react to dangerous situations. What this means is that the court should consider evidence prior to the UF Policy going into effect where Plaintiffs have been required by training or practices to take unnecessary risks with their safety and where there have been improper disciplinary actions, loss of paid work, and improper dismissal from such force.

### C. Plaintiffs Seek an Immediate Injunction and Declaratory Relief.

1.   Plaintiffs seek an immediate injunction against the implementation of SPD's UF Policy that went into effect on January 1, 2014, and all related training, in light of Plaintiffs' serious and significant allegations regarding the unconstitutionality of the UF Policy, and the dangers it creates to the safety of SPD patrol officers and the public.   The immediacy of this injunction is crucial.  Since the intrusion of DOJ in 2011, SPD patrol officers, including new officers at the Academy (CJTC), have been - to the extent that any coherent, sensible 'training' is possible under the new policy - improperly trained, or rather, conditioned to hesitate, to wait,

to not act in the face of threats of danger.  The longer this training/conditioning is ingrained, the harder it will be to undo, and the safety of officers and the public is further endangered for years, if not decades, to come.

2. Plaintiffs further seek a declaratory judgment that the UF Policy is unconstitutional and beyond repair.  Plaintiffs seek a declaration requiring that an entirely new UF policy be drafted as soon as possible, but only after obtaining the advice of recognized leading local and national experts on the science and research related to modern policing and use of force tactics, as well as substantial input from Plaintiffs and other patrol officers with direct experience in appropriate use of force decision making and tactics in Seattle. In this regard, Plaintiffs ask only that the City and SPD do in fact what they committed to do under the Consent Decree, namely draft a UF Policy that is consistent with the constitutional requirements of *Graham*.

## D. Plaintiffs Seek Compensatory Damages.

 Plaintiffs seek compensatory damages for lost time and wages, improper disciplinary action, or any other personnel actions taken against Plaintiffs for violations of the UF Policy where Plaintiffs acted based on constitutional standards and thus within the protection afforded us by the Fourth Amendment.  Plaintiffs believe it is only a matter of time before this complaint will be required to be amended to add compensatory damage claims for an officer(s) damages related to defending a lawsuit alleging that the officers use of force violated SPD policy, even though the use of force was reasonable under the Constitution, or more significantly, to add a damage claim for the serious injury or wrongful death of a patrol officer, who was injured or whose life was taken when he or she hesitated or failed to use appropriate force when responding to a dangerous call.

**E. Plaintiffs Seek Punitive Damages**

Plaintiffs seek punitive damages from Defendants based on Defendants' misinformation about, and ungrounded maligning of, the good work of SPD's patrol officers, as well as Defendants consistent disregard for clearly established standards regarding use of force and concomitant disregard for Plaintiffs' livelihood and safety.  Plaintiffs also seek punitive damages for City and departmental resources and funds redirected away from the needs of patrol officers and wasted instead on the production of an unreasonable, unconstitutional UF Policy, well beyond the scope of the original Memorandum of Understanding and placing at unreasonable risk the lives of officers and the public.

**F. Plaintiffs Seek Attorneys Fees**

Plaintiffs currently represent themselves *pro se* because of the overwhelming costs related to paying an attorney to represent them in this complex civil rights matter.  We have had the benefit of a DC-based former civil rights attorney to consult and assist us in researching and developing these pleadings who has, so far, done so without compensation, recognizing the importance of the issues and the limits on Plaintiffs' ability to pay for representation at this time.  Plaintiffs seek to obtain attorneys fees in this action to pay legal fees incurred so far,

and hope that due to the availability of attorneys fees, we also will be able to obtain in-state counsel to represent them in this court moving forward.

I declare under penalty of perjury that the foregoing is true and correct.


Officer   ROBERT MAHONEY                              Date  5-24-14


Officer                                                Date  5-24-14


Officer                                                Date  5-24-19


Officer                                                Date  5-24-14

# LIST OF PLAINTIFFS

Officer Robert Mahoney, #6296
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Sjon Stevens, #6180
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Cliff Borjeson, #7597
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Christopher Myers, #5452
West Precinct
810 Virginia ST
Seattle, WA 98101
(206) 684-8917

Officer Bridget Hillan, #5938
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Lance Basney, #5947
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Salvatore DiTusa, #5668
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Clarke D. Chase, #5709
North Precinct
10049 College Way N.
Seattle WA, 98133
(206) 684-0850

Officer Joseph Stankovich, #6878
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Weldon C Boyland, #6635
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer John L. Farrar, #5922
North Precinct
10049 College Way N.
Seattle, WA, 98133
(206) 684-0850

Officer Dale W. Umpleby, #4052
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Richard A. McAuliffe, #6403
North Precinct
10049 College Way N.
Seattle WA, 98133
(206) 684-0850

Officer George Baseley, #5571
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Leon J. Towne, #6697
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer David M. Harrington, #6875
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

# LIST OF PLAINTIFFS

Officer Henry Feldman, #7548
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Jeff Mitchell, #6181
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Terry Whalen, #6879
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Robert B. Brown, #6194
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Gilles Montaron, #6382
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Ernest T. Hall, #4792
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Robert Stevenson, #5859
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Robert Burk, #5516
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Joshua Goodwin, #7564
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Adam Beatty, #7453
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Ryan Kennard, #7555
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Tomas Trykar, #7616
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Nathan Lemberg, #7456
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Brien Escalante, #7580
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Ryan Beck, #6898
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Bryan Kennedy, #6768
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

# LIST OF PLAINTIFFS

Officer Karen G. Pio, #6088
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Oscar Gardea, #6680
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Michael Gonzalez, #6412
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Steve Kim, #5955
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Joseph Mahar, #5992
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Ennis Roberson, #6759
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Leroy Outlaw, #6854
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Kieran Barton, #7568
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Jason Hoppers, #6863
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Jonathan Reese, #7533
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Eugene Schubeck, #6696
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Sean Hamlin, #5833
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Shannon Waldorf, #6950
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Brian Whicker, #7492
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Jeffrey Swenson, #7507
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Michael Spaulding, #7491
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

# LIST OF PLAINTIFFS

Officer Tabitha Sexton, #7430
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Steven Stone, #7540
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Liliya A. Nesteruk #7489
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Todd M. Nelson, #7358
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Timothy Jones, #6935
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Thomas Heller, #7427
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Michael Severance, #2866
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Detective Timothy J Wear, #4900
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Detective Theresa Emerick, #5002
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Sgt. Ariel Vela, #4727
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Michael A. Larned, #6955
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Jeffery Johnson, #5845
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Derek B Norton, #6917
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Jason Dewey, #7426
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Brett Willet, #7615
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

## LIST OF PLAINTIFFS

Officer David White, #6404
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Gretchen Hughes, #6237
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Trent Schroeder, #6900
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Audi A. Acuesta, #7417
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Steve Clark, #5987
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Steven L. Berg, #5834
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer John D. Smith, #6291
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Erik Johnson, #5116
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Vernon Kelley, #6662
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Jessica Taylor, #6273
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Shelly San Miguel, #6910
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Christopher J. Anderson, #6609
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Suzanne M. Parton, #5830
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Eric F. Whitehead, #7493
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Brian Hanson, #5954
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

## LIST OF PLAINTIFFS

Officer Alan Richards, #7497
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Jon Emerick, #4326
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Ron Willis, #6081
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Louis Chan, #7424
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer A. Sheheen, #4916
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Randall Higa, #5740
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Sgt. Paul Pendergrass, #4942
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Tim Owens, #6748
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Ted Cablayan, #6236
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Brian Kokesh, #6851
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Tyler Getts, #7537
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer AJ Marks, #6179
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Adam Elias, #6726
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Sgt. Ron Martin, #5041
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

# LIST OF PLAINTIFFS

Officer Rusty L. Leslie, #5209
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer TJ San Miguel, #7506
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Jeffrey C. Page, #6845
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Tyler P. Speer, #7415
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Ryan Ellis, #7612
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer William McCowan, #7607
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Austin Davis, #7617
North Precinct
10049 College Way N.
Seattle, WA 98133
(206) 684-0850

Officer Jack H. Bailey, #5230
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Christopher Coles, #6940
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Cynthia Whitlatch, #6229
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Randy R. Ellis, #5514
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Jose Silva, #6919
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Alfred R.l Warner, #6162
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Michael R. Washington, #5143
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Aaron Stoltz, #6073
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Sgt. Theodore G. Visaya, #5237
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

# LIST OF PLAINTIFFS

Officer William K. Campbell, #6887
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Donald D. Bolton, #5256
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Steven E. Pomper, #5827
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Ronald J. Campbell, #6693
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Nina M. Jones, #7567
North Precinct
10049 College WY N
Seattle, WA 98133
(206) 685-0850

Officer Anthony Jones Reynolds, #7585
South Precinct
3001 S. Myrtle ST
Seattle, WA 98108
(206) 386-1850

Officer Richard Heintz, #4219
South West Precinct
2300 SW Webster ST
Seattle, WA 98106
(206) 733-9800

Officer Lori K. Aagard, #5011
East Precinct
1519 12 Ave.
Seattle, WA 98122
(206) 684-4800

Officer Curtis Gerry, #5823
SPD Range
11030 E Marginal WY S
Tukwila, WA 98168
(206) 684-7470

Officer Adolph Torrescano, #4743
SPD Range
11030 E Marginal WY S
Tukwila, WA 98168
(206) 684-7470

Officer Curt E. Wilson, #4505
SPD Range
11030 E Marginal WY S
Tukwila, WA 98168
(206) 684-7470

Officer James G. Thomsen, #6738
SPD Range
11030 E Marginal WY S
Tukwila, WA 98168
(206) 684-7470

Officer Richard W. Pruitt, #5346
SPD Range
11030 E Marginal WY S
Tukwila, WA 98168
(206) 684-7470

Detective Donald L. Waters, #6287
SPD Range
11030 E Marginal WY S
Tukwila, WA 98168
(206) 684-7470

## LIST OF PLAINTIFFS

Officer Anthony J. Reynolds #7585
South Precinct
3001 S. Myrtle St
Seattle, WA 98108
(206) 386-1850

Officer Richard Heintz #4219
Southwest Precinct
2300 SW Webster St
Seattle, WA 98106
(206) 733-9800

Officer Jonard A. Legaspi #6231
SPD Range
11030 E Marginal Wy S
Tukwila, WA 98168
(206) 684-7470

Officer Nina M. Jones #7567
North Precinct
10049 College Wy N
Seattle, WA 98133
(206) 684-0850

✓

_____     _____
Officer *BRIDGET K. HILLAN*          Date  01·30·14

_____     _____
*LANCE BASNEY    #5947*              Date  1-30-14
Officer

_____     _____
*SALVATORE DITUSA - 5448*           Date  1-30-14
Officer

_____     _____
*CLARK CHASE*                        Date  1-30-14
Officer

_____     _____
*JOSEPH STANKOVICH*                  Date  1-30-2014
Officer

_____     _____
*WELDON BOYLAND*                     Date  1-30-14
Officer

_____     _____
*JOHN L. FARRAR*                     Date  1-30-2014
Officer

SPD Patrol Officers § 1983 Complaint

_Dale W. Umpleby_
DALE W. UMPLEBY
**Officer**

1-30-14
**Date**

_Rich M'Auliffe_  6803
**Officer**

1.30.14
**Date**

GEORGE BASELEY   5571
**Officer**

1/30/14
**Date**

LEON J. TOWNE   6697
**Officer**

1/30/14
**Date**

DAVID M. HARRINGTON   6875
**Officer**

1-30-14
**Date**

HENRY I FELDMANN   7548
**Officer**

1-30-14
**Date**

TERRY WHALEN   6879
**Officer**

1-30-14
**Date**

SPD Patrol Officers §  1983 Complaint

Cliff Bergess 7597

Officer

1-30-14

Date

GILLES MONTAROU 6382

Officer

1-30-14

Date

ROBERT STEVENSON 5859

Officer

1-30-14

Date

JOSHUA GOODWIN 7564

Officer

01/30/2014

Date

RYAN KENNARD 7555

Officer

1-30-14

Date

NATHAN LEMBERG 7456

Officer

1/30/14

Date

Ryan Beck 6898

Officer

1/30/14

Date

SPD Patrol Officers § 1983 Complaint

JEFF MITCHELL 6161      01/30/14
_____    _____
Officer                               Date

ROBERT B. BROWN 6194    01/30/2014
_____    _____
Officer                               Date

ERNEST T. HALL 4792    1-30-2014
_____    _____
Officer                               Date

ROBERT BURK #5516    1-30-14
_____    _____
Officer                               Date

ADAM D. BEATTY # 7453    1-30-14
_____    _____
Officer                               Date

Tomas Trykar # 7616    01/30/14
_____    _____
Officer                               Date

BRIEN ESCALANTE # 7580    01/30/14
_____    _____
Officer                               Date

SPD Patrol Officers § 1983 Complaint

_[signature]_ #6768          2-1-14
Officer BRYAN J KENNEDY          Date

_[signature]_ 6099          2-1-14
Officer          Date
KAREN G. PIO

_[signature]_ #6180          2-1-14
Officer OSCAR Gardea          Date

_[signature]_ #6412          2/1/14
Officer GONZALEZ, MICHAEL D          Date

_[signature]_ 5955          2/1/14
Officer Kim, Steve          Date

_[signature]_          2/1/14
Officer MAHER, JOSEPH          Date

_[signature]_          2-1-14
Officer ARATA, JAMES H          Date

SPD Patrol Officers § 1983 Complaint

#7417

ACUESTA

01/31/14

Officer                                          Date

Officer STEVE CLARK #5987

1 FEB 2014

Date

STEVEN L. BERB 5834

2/1/2014

Officer                                          Date

JOHN D. Smith #6291

2/1/2014

Officer                                          Date

ERIK JOHNSON #5116

2/1/2014

Officer                                          Date

VERNON KELLEY

2-1-14

Officer                                          Date

J. Taylor

2.1.14

Officer                                          Date

SPD Patrol Officers § 1983 Complaint

Officer SHELLEY SAN MIGUEL 6910

Date 1-30-14

Officer

Date

Officer CHRIS J ANDERSON

Date 1-30~14

Officer SUZANNE M. PARTON 5030

Date 2/1/14

Officer ERIC F. WHITEHEAD 7493

Date 2-1-14

Officer BRIAN HANSON 5954

Date 2-1-14

Officer ALAN RICHARDS #7497

Date 2-1-14

SPD Patrol Officers § 1983 Complaint

Officer   ENNIS ROBERSON #6759     Date   2-3-14

Officer   LEROY OUTLAW III / 6854     Date   02-03-2014

Officer   KIERAN BARTON 7565     Date   2-3-2014

Officer   Jason Hoppers 6863     Date   2-3-14

7533     Date   2-2-14
Officer   Jonathan Pham

Officer   MARK S. BODY 4746     Date   02-03-14

Officer   Eugene Schubeck 6696     Date   2-3-14

SPD Patrol Officers § 1983 Complaint

SEAN HAMLIN #5853

Officer

2/1/14

Date

SHANNON WALDORF #6950

Officer

2/1/14

Date

_____

Officer

_____

Date

_____

Officer

_____

Date

_____

Officer

_____

Date

_____

Officer

_____

Date

_____

Officer

_____

Date

SPD Patrol Officers §  1983 Complaint

_____     _____
Officer                             Date

_____     _____
TODD M. NELSON #7358                2/3/14
Officer                             Date

_____     _____
6935  TIM JONES                     2-3-14
Officer                             Date

Thomas Heller
_____     _____
#7437                               2/3/14
Officer                             Date

Michael Severance
MICHAEL SEVERANCE #2866             2/7/14
_____     _____
Officer                             Date

_____     _____
TIMOTHY J DEAR        #4900         2/7/14
Officer                             Date

Theresa Emerick
Theresa Emerick #5002               2/7/14
_____     _____
Officer                             Date

SPD Patrol Officers § 1983 Complaint

Brian   Whicker   #7490

Officer

2-3- 14

Date


Jeffrey   Swenson   @ 7507

Officer

2.3.14

Date


Michael   Spaulding   #7491

Officer

2-3-14

Date


_____

Officer

_____

Date


Tabitha   Sexton   #7430

Officer

02/3/14

Date


Steven   Stowe   #7540

Officer

02/3/2014

Date


Liliya   Nesdeeth   #7489

Officer

2/3/2014

Date


SPD Patrol Officers § 1983 Complaint

Officer  MICHAEL LARNED  #6953            Date  2/16/14

Officer  JEFFREY JOHNSON                  Date  2·16·14

Officer  DEREK B. NORTON #6917           Date  2-16·14

Officer  JASON  DEWEY  #7426              Date  02/19/2014

Officer                                   Date

Officer                                   Date

Officer                                   Date

SPD Patrol Officers § 1983 Complaint

_A. Vela_ #4727     2-10-14
Officer   ARIEL VELA       Date

_____   _____
Officer                                  Date

_____   _____
Officer                                  Date

_____   _____
Officer                                  Date

_____   _____
Officer                                  Date

_____   _____
Officer                                  Date

_____   _____
Officer                                  Date

SPD Patrol Officers § 1983 Complaint

_____ 4916       _____
Officer  H. SHEHEEN         1-30-2014
                                                                Date

_____ 5740       _____
Officer  RANDALL HIGA        1-30-2014
                                                                 Date

_____ 6748       _____
Officer  TOM OWENS         1-30-2014
                                                                 Date

_____            _____
Officer                                                                      Date

_____ 7537       _____
Officer  TYLER GETTS         1-30-2014
                                                                 Date

_____ 6726       _____
Officer  ADAM ELIAS         01/30/14
                                                                 Date

_____ A926       _____
Officer  JON EMERICK        1-30-14
                                                                 Date

SPD Patrol Officers § 1983 Complaint

LOUIS CHAN    7424
Officer

1/30/14
Date

_____
Officer

_____
Date

PAUL PENDERGRASS    4942
Officer

1/30/2014
Date

TED CABLAYAN    #6236
Officer

01-30-2014
Date

BRIAN KOKESH    #6851
Officer

1/30/2014
Date

AJ MARKS #6179
Officer

01-30-2014
Date

SGT. RONALD A. MARTIN
Officer

1·30·2014
Date

SPD Patrol Officers § 1983 Complaint

*Jack Bailey*

JACK BAILEY  #5230

_____    02/08/14
Officer                                                      Date

*A. Coles*

CHRISTOPHER  COLES #6940       2/8/14
_____    _____
Officer                                                      Date

*Cy*

Cynthia  Whitlatch  6229       2/8/14
_____    _____
Officer                                                      Date

*Randy R. Ellis*

Randy R. Ellis #5514       02/08/14
_____    _____
Officer                                                      Date

Jose Silva  #6919       2/8/14
_____    _____
Officer                                                      Date

WARNER, AL #6502       2/8/14
_____    _____
Officer                                                      Date

M. Washington #5143
MIKE WASHINGTON       2/8/14
_____    _____
Officer                                                      Date

SPD Patrol Officers §  1983 Complaint

RUSTY LESLIE

_____
Officer

1-30-14

_____
Date


TJ SAN MIGUEL

_____
Officer

01/30/14

_____
Date


JEFFREY C. PAGE #6845

_____
Officer

01/30/2014

_____
Date


Tyler P. Speer #7415

_____
Officer

1/30/14

_____
Date


Ryan Ellis #7412

_____
Officer

1/30/14

_____
Date


William McCowan #7607

_____
Officer

1/30/2014

_____
Date


AUSTIN DAVIS #7617

_____
Officer

1/30/14

_____
Date


SPD Patrol Officers § 1983 Complaint

Brett Willet    #7615

_____    _____
Officer                            2-3-14
                                   Date

David White #6404

_____    _____
Officer                            2-6-14
                                   Date

GRETCHEN HUGHES #6237

_____    _____
Officer                            02-07-14
                                   Date

TRENT SCHROEDER #6900

_____    _____
Officer                            2-24-14
                                   Date

_____    _____
Officer                            Date

_____    _____
Officer                            Date

_____    _____
Officer                            Date

SPD Patrol Officers § 1983 Complaint

_Ron M. Willis_
Officer Ron M. Willis

_04 March 2014_
Date

_____
Officer

_____
Date

_____
Officer

_____
Date

_____
Officer

_____
Date

_____
Officer

_____
Date

_____
Officer

_____
Date

_____
Officer

_____
Date

Officer  DONALD L. WATERS #6287          02/14/2014

Officer                                  Date


_____                  _____
Officer                                  Date


_____                  _____
Officer                                  Date


_____                  _____
Officer                                  Date


_____                  _____
Officer                                  Date


_____                  _____
Officer                                  Date


_____                  _____
Officer                                  Date


SPD Patrol Officers § 1983 Complaint

Officer    CURTIS GERRY    5823        Date    2-24-2014

Officer   ADOLPH TORRESCANO #4743     Date    2-24-2014

Officer   CURT E. WILSON #4505      Date    2-24-2014

Officer   JAMES G. Thomsen #6738     Date    2-24-2014

Officer   RICHARD W. PRUITT #5346    Date    02-24-2014

Officer                      Date

Officer                      Date

SPD Patrol Officers § 1983 Complaint

AARON STOLTZ #6079

Officer
_____

2/8/14

Date
_____


THEODORE G. VISAYA 5237

Officer
_____

2/8/14

Date
_____


WILLIAM K. CAMPBELL 6887

Officer
_____

2-8-14

Date
_____


DONALD D. BOLTON 5256

Officer
_____

2/8/14

Date
_____


_____
Officer

_____
Date


_____
Officer

_____
Date


_____
Officer

_____
Date

_[signature]_ #5827

Officer STEVEN POMPER

2/17/14

Date

_[signature]_ #6693

Officer RON CAMPBELL

2/17/14

Date

_[signature]_

Officer

2/7/14

Date

_____

Officer

_____

Date

_____

Officer

_____

Date

_____

Officer

_____

Date

_____

Officer

_____

Date

SPD Patrol Officers § 1983 Complaint

_MOORE, SEAN N.   #5995_
Officer

02/26/2014
Date

_LEE, ENOCH_
Officer

5/26/2014
Date

_____
Officer

_____
Date

_____
Officer

_____
Date

_____
Officer

_____
Date

_____
Officer

_____
Date

_____
Officer

_____
Date

SPD Patrol Officers §  1983 Complaint

*(Cut Here)*

I declare under penalty of perjury that the foregoing complaint is true and correct.

Officer ___*(Signature & Serial #)* #7585___          ___09 APR 2014___ *(Date)*

Officer ___Anthony James Reynolds___
*(Printed Name)*

Precinct ___South, 1st Watch, Sam Sector___

---

*(Cut Here)*

I declare under penalty of perjury that the foregoing complaint is true and correct.

Officer ___*(Signature & Serial #)* #7567___          ___APRIL 10, 2014___ *(Date)*

Officer ___JONES, NINA M. #7567___
*(Printed Name)*

Precinct ___NORTH PCT- PATROL, 1ST WATCH, JOHN SECTOR___

_____

_____

(*Cut Here*)

I declare under penalty of perjury that the foregoing complaint is true and correct.

Officer  _A Reyn__  – 6231_____     _05-31-2014_____
                (Signature & Serial #)                                    (Date)

Officer  _JONARD  H. LEGASPI_____
                            (Printed Name)

Precinct  _FIREARMS  TRAINING  SQUAD_

_____

(*Cut Here*)

I declare under penalty of perjury that the foregoing complaint is true and correct.

Officer  _Richard Heintz  4219_____     _4-16-2014_____
                (Signature & Serial #)                                    (Date)

Officer  _RICHARD  HEINTZ_____
                            (Printed Name)

Precinct  _SW  PRECINCT_____

## LIST OF DEFENDANTS

Eric Holder, individually
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 514-2001

Thomas E. Perez, individually
Former Assistant Attorney General
Civil Rights Division (CRD)
U.S. Department of Justice
Currently, U.S. Secretary of Labor
200 Constitution Ave., NW
Washington, DC  20210
(202) 693-6000

Jonathan M. Smith, individually
Chief Special Litigation Section, CRD
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 514-6255

Jocelyn Samuels, individually
Acting Assistant Attorney General, CRD
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 514-4609

Emily A. Gunston, individually
Trial Attorney
Special Litigation Section, CRD
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 514-6255

Timothy D. Mygatt, individually
Special Counsel
Special Litigation Section,CRD
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 514-6255

Jenny A. Durkan, individually
United States Attorney
Western District of Washington
U.S. Attorney's Office
700 Stewart St. Suite 5220
Seattle, Washington 98101
(206) 533-7970

City of Seattle, including Seattle Police
Monitor Team, Seattle Police
Department, and
Seattle City Attorney's Office
600 4th Ave, Seattle, WA
Seattle, WA 98104

Merrick Bobb, Seattle Monitor, individually
and in his official capacity
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

Peter Ehrlichman, Deputy Monitor,
individually and in his official capacity
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

Ronald Ward, Assistant Monitor,  individually
and in his official capacity
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

Matthew Barge, Deputy Director,  individually
and in his official capacity
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

Ed Murray, Mayor, individually and in his
official capacity
600 4th Ave,
7th Floor
Seattle, WA 98104
(206) 684-4000

## LIST OF DEFENDANTS

Mike McGinn, individually
Former Mayor, City of Seattle
8556 Dayton Ave N
Seattle, WA 98103

Chief of Police,
individually and in his or her official capacity
Seattle Police Department
610 5th Avenue,
Seattle, WA 98124-4986
206-265-5011

John Diaz, individually
Former Chief, SPD
Current address unknown

James Pugel, individually
Former Interim Chief, SPD
Current address unknown

Peter S. Holmes, City Attorney, individually
and in his official capacity
600 4th Avenue, 4th Floor
PO Box 94769
Seattle, WA 98124-4769
(206) 684-8200