1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10  ROBERT MAHONEY et al.,                          CASE NO. C14-794 MJP

11                      Plaintiffs,                 ORDER ON MOTIONS TO DISMISS

12          v.

13  ERIC HOLDER et al.,

14                      Defendants.

15

16          THIS MATTER comes before the Court on Defendant Merrick Bobb's Motion to

17  Dismiss on quasi-judicial immunity grounds (Dkt. No. 19) and Defendants City of Seattle,

18  Mayor Ed Murray, and City Attorney Peter Holmes's Motion to Dismiss for failure to state a

19  claim (Dkt. No. 25). Certain represented Plaintiffs responded to the Motions, while the

20  remaining pro se Plaintiffs failed to respond. Having reviewed the motions, the Represented

21  Plaintiffs' Responses (Dkt. Nos. 36, 59), Defendant Bobb's Reply (Dkt. No. 54), the City

22  Defendants' Reply (Dkt. No. 62), and all related papers, the Court hereby GRANTS both

23  Motions and DISMISSES the case with prejudice.

24

1                                   **Summary**

2         In this case, certain officers with the Seattle Police Department are challenging a Use of

3 Force Policy adopted in response to an earlier lawsuit filed against the City of Seattle by the

4 United States Department of Justice. In the earlier lawsuit, the Department of Justice claimed

5 that the Seattle Police Department engaged in a pattern or practice of excessive use of force. As a

6 condition of settlement, the City of Seattle agreed to create new policies aimed at preventing this

7 pattern from repeating. One of the key players in creating the Use of Force Policy was Merrick

8 Bobb, a "Monitor" appointed as an agent of the court to assist in the policy-drafting process,

9 among other tasks. Although many groups gave feedback as the Use of Force Policy was being

10 developed, individual officers of the Seattle Police Department were not a party to the lawsuit or

11 the ensuing negotiations.

12         The officers now argue the new Use of Force Policy violates their constitutional rights by

13 constraining their options in defending themselves against potentially dangerous suspects. They

14 also argue that the way the Use of Force Policy was drafted violates the Constitution. They ask

15 the Court to stop the implementation of the Use of Force Policy, to declare the Use of Force

16 Policy unconstitutional, and to award them money damages.

17         As the Court explains in greater detail below, the officers' constitutional arguments are

18 not supported by the text of the Constitution or case law interpreting the Constitution. In

19 addition, the officers cannot sue the court-appointed Monitor Merrick Bobb because he has

20 "absolute immunity" from lawsuits relating to his actions assisting in the resolution of the earlier

21 lawsuit. This immunity is known as "quasi-judicial" because it is derived from the immunity

22 given to judges, and Merrick Bobb is entitled to it both because he was appointed as an agent of

23

24

1  a judge and because he was engaged in activities that parallel those of a judge. Because the

2  officers' case is not supported by the Constitution or case law, the Court dismisses the lawsuit.

3  **Background**

4        The Represented Plaintiffs and Plaintiffs representing themselves are police officers

5  employed by the Seattle Police Department ("SPD") who have filed suit to challenge the Use of

6  Force Policy ("Policy") adopted by the City of Seattle ("City") pursuant to a consent decree and

7  settlement with the United States Department of Justice ("DOJ"). (Dkt. No. 13 at 3–4; see Case

8  No. C12-1282-JLR, United States v. City of Seattle.) In the first lawsuit, the Department of

9  Justice claimed that after "an extensive investigation of the Seattle Police Department [ . . .], the

10  United States [ ] determined that SPD engages in patterns or practices of using unlawful force

11  that systematically deny the people of Seattle their constitutional rights." (Case No. C12-1282-

12  JLR, Compl. & DOJ Report, Dkt. No. 1 at 2, cited in Am. Compl., Dkt. No. 13 at 3.) The

13  settlement agreement and its central components, including the use of force policy it pledged to

14  produce, had the "goal of addressing the policies, procedures, training, and oversight that the

15  United States alleges contributed to a pattern or practice of constitutional violations." (See Case

16  No. C12-1282-JLR, Joint Motion and Proposed Order for Approval of Settlement Agreement,

17  Dkt. No. 3 at 2–3, cited in Am. Compl., Dkt. No. 13 at 3–4; see also Settlement Agreement,

18  Ryan-Lang Decl., Dkt. No. 12-1 at 17–18, cited in Am. Compl. Dkt. No. 13 at 3–4; id.,

19  Memorandum Submitting Use of Force Policy, Dkt. No. 12-2 at 57–58, cited in Am. Compl.,

20  Dkt. No. 13 at 4.) The agreement included a plan for a court-appointed Monitor. (Dkt. No. 12-1

21  at 52–70; Dkt. No. 12-2 at 5–6.) According to the court-appointed Monitor when he submitted

22  the Policy to the court, the Policy was "calibrated to bring about Constitutional policing without

23

24

1   sacrificing the safety and well-being of police officers or the general public." (Dkt. No. 12-2 at

2   58.)

3          Plaintiffs now allege the Policy is too solicitous of the rights of those being policed and

4   insufficiently concerned with the rights of those employed as police officers. (See Am. Compl.,

5   Dkt. No. 13 at 2.) Plaintiffs bring their claims under § 1983 and Bivens, alleging the creation and

6   implementation of the Policy violates their own Second and Fourth Amendment rights, their

7   "right of self-defense as embedded in the Fourth Amendment,"  the Equal Protection Clause, and

8   substantive and procedural due process. (Id. at 22–28.) They seek a declaration that the Policy

9   infringes on their constitutional rights as well as injunctive relief and damages. (Id. at 28–29.)

10          In addition to the City, Mayor Ed Murray, and City Attorney Peter Holmes, Plaintiffs

11   filed suit against federal actors involved in the settlement agreement and formulation of the

12   Policy. One of those Defendants is Merrick Bobb, the court-appointed Monitor in the underlying

13   litigation. Plaintiffs allege that Mr. Bobb is liable for the constitutional errors they identify in the

14   Policy because he allegedly seized control over the drafting process and refused input from the

15   Seattle Police Department and its officers. (See Dkt. No. 13 at 5.)

16          The City Defendants now move to dismiss the Amended Complaint, arguing Plaintiffs'

17   allegations fail to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 25.)

18   Defendant Bobb also moves to dismiss on the grounds of quasi-judicial immunity. (Dkt. No. 19.)

**Analysis**

19

20   I.      Legal Standards

21      A.  Motion to Dismiss

22          To survive a motion to dismiss, a complaint must state a claim for relief that is plausible

23   on its face. Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Courts follow a

24

two-step approach when deciding whether a complaint survives a 12(b)(6) motion. Id. at 678–79.
First, "a court must accept as true all of the allegations contained in a complaint" unless the
allegations are legal conclusions. Id. Second, the Court must decide whether the claim for relief
is plausible—a context-specific task. Id.

B.  Evidence and Related Proceedings at the Motion to Dismiss Stage

Federal Rule of Evidence 201(b) provides that the Court "may judicially notice a fact that
is not subject to reasonable dispute because it . . . can be accurately and readily determined from
sources whose accuracy cannot reasonably be questioned." Thus, the Court may take notice of
"documents [that] are not physically attached to the complaint . . . if the documents' 'authenticity
. . . is not contested' and 'the plaintiffs complaint necessarily relies' on them." Lee v. City of Los
Angeles, 250 F.3d 668, 688 (9th Cir. 2001) (citations omitted) (overruled on other grounds by
Galbraith v. County of Santa Clara, 307 F.3d 1119, 1125–26 (9th Cir. 2002)). The Court may
take judicial notice of "proceedings in other courts, both within and without the federal judicial
system, if those proceedings have a direct relation to matters at issue." Bias v. Moynihan, 508
F.3d 1212, 1225 (9th Cir. 2007). However, judicial notice may not extend to disputed facts stated
within public records. Lee, 307 F.3d at 690.

II.      The Monitor and Quasi-Judicial Function

Defendant Bobb argues the claims against him must be dismissed because he has
absolute quasi-judicial immunity from suit in his role as Monitor. (Dkt. No. 19.) "Absolute
judicial immunity insulates judges from charges of erroneous acts or irregular action." Burton v.
Infinity Capital Management, 753 F.3d 954, 959 (9th Cir. 2014) (quotation marks and citations
omitted). It "is not reserved solely for judges, but extends to nonjudicial officers for all claims
relating to the exercise of judicial functions." Id. (quotation marks and citations omitted). "The

proponent of a claim to absolute immunity bears the burden of establishing the justification for

such immunity." <u>Antoine v. Byers & Anderson, Inc.</u>, 508 U.S. 429, 432 (1993). "To qualify for

absolute immunity, the function performed must be a judicial act with 'a sufficiently close nexus

to the adjudicative process.' However, 'it is only when the judgment of an official other than a

judge involves the exercise of discretionary judgment that judicial immunity may be extended to

that nonjudicial officer.'" <u>Burton</u>, 753 F.3d at 960 (citations omitted). "To be protected, the

function performed must 'involve the exercise of discretion in resolving disputes.'" <u>Id.</u> Among

the nonjudicial officers that have been extended quasi-judicial immunity are bankruptcy trustees,

<u>id.</u>, and court-appointed special masters. <u>Atkinson-Baker & Assocs., Inc. v. Kolts</u>, 7 F.3d 1452,

1455 (9th Cir. 1993).

　　　　Plaintiffs acknowledge Mr. Bobb was appointed by the Court in the underlying litigation

to "oversee implementation of the Consent Agreement." (Dkt. No. 13 at 4.) According to the

Order Approving Consensus Use of Force Policies, a document cited by Plaintiffs (Dkt. No. 13

at 3), "[t]he role of the court, and the Monitor who serves as an agent of the court, [was] not to

dictate policies to the SPD, but rather to insure that the Proposed Policies conform to the

requirements of the Consent Decree, the United States Constitution, and judicial decisions

interpreting the City's constitutional obligations." (Dkt. No. 12-2 at Ex. 8, p. 65.) Plaintiffs

allege that while Mr. Bobb agreed it was not his role to write the Policy (Dkt. No. 13 at 4, citing

the Memorandum, Dkt. No. 12-2 at Ex. 7), the Policy was "altered almost in its entirety and

replaced with specific language provided, and required, by the Monitor." (Dkt. No. 13 at 5.)

According to Plaintiffs, this "language" was the outcome preferred by the DOJ as opposed to the

City. (<u>See id.</u> at 5, 27.) The Court must accept for the purpose of this motion that Mr. Bobb

seized control over the drafting process, implemented the DOJ's preferred solutions, and refused

1   input from other stakeholders such as officers of the Seattle Police Department. The question

2   remains whether these alleged acts deprived him of quasi-judicial immunity for his role in the

3   process.

4        Plaintiffs argue that because the Consent Decree did not grant the Monitor the power to

5   draft the Policy unilaterally, his actions were not "judicial." (See Dkt. No. 36 at 6.) Plaintiffs

6   concede "judicial" acts have been defined by the Supreme Court to encompass "the function of

7   resolving disputes between parties, or of authoritatively adjudicating private rights." (Id. at 5,

8   citing Antoine, 508 U.S. at 435–36.) It is clear that Mr. Bobb was appointed by the district court

9   to oversee formulation of a Policy which was both the product and the subject of an ongoing

10  "dispute between parties"—namely, the City of Seattle and the United States Department of

11  Justice. According to Plaintiffs, Mr. Bobb agreed with the DOJ's preferred solutions and

12  disagreed with the outcome preferred by Plaintiffs (who were not formal parties to the litigation).

13  Still, this alleged course of action does not deprive his conduct of judicial character. Far from it:

14  judges are usually persuaded by one side as opposed to another as they adjudicate disputes in our

15  adversarial system. An outcome that favors one party is no less a "resolution" because it does not

16  please all stakeholders. Here, the Court agrees with Defendant Bobb that even if Mr. Bobb

17  engaged in the conduct Plaintiffs assign to him, he was engaged in an essential judicial function:

18  that of resolving a dispute between the parties to the City of Seattle litigation at the request of a

19  federal district court judge.

20       Furthermore, that function involved discretion. See Burton, 753 F.3d at 960. Plaintiffs do

21  not argue Mr. Bobb was constrained to take a single course of action with respect to the drafting

22  of the policy, in the manner that a court reporter must produce a verbatim transcript of court

23  proceedings. Cf. Antoine, 508 U.S. at 436–37 (holding that court reporters are not entitled to

24

ORDER ON MOTIONS TO DISMISS- 7

1   quasi-judicial immunity because they are afforded no discretion in carrying out their duties).

2   Rather, Plaintiffs argue that he formulated a policy that contained terms that favored one side in

3   the dispute (Dkt. No. 36 at 4)—in other words, that he used his court-endowed discretion to

4   reach a result Plaintiffs do not agree with.

5        Because Defendant Bobb exercised discretion in resolving a dispute at the request of a

6   district judge, he is entitled to absolute quasi-judicial immunity from suit and the charges against

7   him must be dismissed.

8        III.   City's Substantive Motion to Dismiss

9        The City Defendants move to dismiss on the basis that Plaintiffs' allegations fail to state

10  a claim under the Second or Fourth Amendments, the Equal Protection Clause, or the Due

11  Process Clause. (Dkt. No. 25.)

12       A.  Second Amendment

13       The City Defendants argue the Policy does not violate Plaintiffs' Second Amendment

14  rights because while the Second Amendment protects an individual's right to bear arms, the

15  Second Amendment does not provide that individuals have a right to use a firearm in any

16  particular way. (Dkt. No. 25 at 7.) Plaintiffs contend that the Second Amendment codified a

17  preexisting right to self-defense, and the Policy burdens that right. (Dkt. No. 59 at 4.)

18       The Ninth Circuit has adopted a two-step test for analysis of Second Amendment claims:

19  (1) the court asks whether the challenged law burdens conduct protected by the Second

20  Amendment, and (2) if so, the court determines whether the law meets the appropriate level of

21  scrutiny. See Jackson v. City & Cnty. of San Francisco, 746 F.3d 953, 960 (9th Cir. 2014); see

22  also Peruta v. Cnty. of San Diego, 742 F.3d 1144, 1175 (9th Cir. 2014) (declining to apply a

23  particular level of scrutiny in light of the type of Second Amendment burden imposed).

24

1    Plaintiffs can point to no case establishing that the Second Amendment codified a free-

2    standing right to self-defense, as opposed to case law interpreting the textual Second Amendment

3    rights to "keep and bear arms" in light of their purposes (which the Supreme Court has held

4    include the facilitation of self-defense). See, e.g., District of Columbia v. Heller, 554 U.S. 570,

5    628 (2008) ("As the quotations earlier in this opinion demonstrate, the inherent right of self-

6    defense has been central to the Second Amendment right. The handgun ban amounts to a

7    prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for

8    that lawful purpose."). In the criminal context, the Ninth Circuit rejected the idea that recent

9    Supreme Court cases confirmed a Second Amendment right to use a weapon in any particular

10   way: "[N]either [Heller nor McDonald] concerned the use of a weapon, as distinct from mere

11   possession. . . ." United States v. Morsette, 622 F.3d 1200, 1202 (9th Cir. 2010). Similarly,

12   nothing in the Supreme Court's recent Second Amendment jurisprudence lends support to

13   Plaintiffs' novel theory that a police department policy outlining expectations for an officer's use

14   of force can burden conduct protected by the Second Amendment.

15   Instead, the Supreme Court has been clear that "the right secured by the Second

16   Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in

17   any manner whatsoever and for whatever purpose." Heller, 554 U.S. at 626. Plaintiffs selectively

18   quote historical sources cited in Heller to suggest that so long as self-defense is a purpose for the

19   individual claiming a Second Amendment right, the Second Amendment forbids "unreasonable"

20   restrictions on the manner a weapon is used. (Dkt. No. 59 at 4.) In fact, contemporaneous sources

21   relied on by the Supreme Court and the Ninth Circuit show that restrictions on the manner in

22   which a weapon is used fall outside the scope of the Second Amendment. For example, the Ninth

23   Circuit quoted and the Supreme Court cited the following nineteenth-century footnote: "[I]t is

24

generally held that statutes prohibiting the carrying of concealed weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms <u>in a particular manner</u>, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence." <u>The American Students' Blackstone: Commentaries on the Laws of England</u> 84 n.11 (George Chase ed., 3d ed. 1890) (emphasis supplied) (cited in <u>Peruta v. County of San Diego</u>, 742 F.3d 1144, 1165 (9th Cir. 2014) and <u>District of Columbia v. Heller</u>, 554 U.S. 570, 626 (2008)). Similarly, the Ninth Circuit relied on nineteenth-century legal commentator John Ordronaux for the proposition that "the [Second] Amendment has never prevented 'a State from enacting laws regulating the manner in which arms may be carried.'" <u>Peruta</u>, 742 F.3d at 1165. According to the Ninth Circuit, these sources and case law demonstrate that "<u>regulation</u> of the right to bear arms is not only legitimate but quite appropriate." <u>Id.</u> at 1178 (emphasis in original). In addition to the categories of regulation specifically described in <u>Heller</u>, the Ninth Circuit stated, "Nor should anything in this opinion be taken to cast doubt on the validity of measures designed to make the carrying of firearms for self-defense as safe as possible, both to the carrier and the community." <u>Id.</u> at 1178.

Here, the Policy represents an effort by an employer, the Seattle Police Department, to regulate the use not only of (employer-issued) weapons but of the force its employees are specially sanctioned to wield on behalf of the city government. This scenario has no relation to the Second Amendment guarantees for individuals recognized in <u>Heller</u>, <u>McDonald</u>, and <u>Peruta</u>.

Because the Policy does not burden conduct protected by the Second Amendment, the Court need not proceed to the second step of the analysis. Plaintiffs fail to state a plausible Second Amendment claim.

B.  <u>Fourth Amendment</u>

Plaintiffs' Fourth Amendment argument rests on two grounds: the notion that the Policy itself effects a metaphorical "seizure" (Dkt. No. 59 at 9–11) and the notion that the case law analyzing the limits of citizens' Fourth Amendment rights against the government can be flipped inside out to describe the positive rights of government actors (such as police officers) against citizens (<u>id.</u> at 11–12). Both grounds grossly misconstrue Fourth Amendment law.

Fourth Amendment seizures of persons are neither figurative nor hypothetical. The definition requires that a government actor "by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement [ . . . ] through means intentionally applied." <u>Brendlin v. California</u>, 551 U.S. 249, 254 (2007). The Policy does not affect officers' freedom of movement, so it does not "seize" Plaintiffs, even if, as Plaintiffs allege, the Policy places them at increased risk of injury. (<u>See</u> Dkt. No. 59 at 9.)

Plaintiffs further argue that cases analyzing the Fourth Amendment rights of citizens have recognized a "countervailing governmental interest[ ]"—thus purportedly endowing police officers with a Fourth Amendment right to use force. (<u>See</u> Dkt. No. 59 at 11, citing <u>Graham v. Conner</u>, 490 U.S. 386, 396 (1989)). This argument misses the mark entirely. A balancing test establishing the boundary where government action infringes on a citizen's Fourth Amendment rights cannot be reinterpreted as a positive Fourth Amendment right for government actors to inflict force up to that boundary.

Plaintiffs fail to state a claim under the Fourth Amendment.

C.  <u>Equal Protection Clause</u>

Plaintiffs base their Equal Protection Clause claim on the idea that the Policy burdens "fundamental rights" embedded in the Second and Fourth Amendments. (<u>See</u> Dkt. No. 59 at 12–

13 (citing <u>Tucson Woman's Clinic v. Eden</u>, 371 F.3d 1173, 1185 (9th Cir. 2004).) The Court has

already analyzed Plaintiffs' Second and Fourth Amendment arguments and found them wanting.

No Supreme Court case identifies self-defense as a "fundamental right" on par with the right to

marry or to vote.

Plaintiffs also fail to make even the most rudimentary showing in an equal protection

claim: they fail to describe themselves as members of an affected class similarly situated to those

outside the class. <u>See</u> <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985) ("The

Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to

any person within its jurisdiction the equal protection of the laws,' which is essentially a

direction that all persons similarly situated should be treated alike."). Plaintiffs, like all officers

with the Seattle Police Department, are subject to the Policy; they have identified no group that

is similarly situated yet not subject to the Policy.

Plaintiffs fail to state a claim under the Equal Protection Clause.

D.  <u>Substantive Due Process</u>

Plaintiffs allege substantive due process claims "for both their rights enumerated in the

Second Amendment, Fourth Amendment, and Equal Protection Clause" and "for their

independent constitutional right to self-defense." (Dkt. No. 59 at 13–14.) As Plaintiffs

acknowledge, substantive due process claims that relate to other constitutional provisions must

be analyzed under the legal standards established for those provisions. <u>See</u> <u>Graham v. Connor</u>,

490 U.S. 386, 394 (1989). As the Court has already explained, Plaintiffs fail to state a claim

under the Second or Fourth Amendment or the Equal Protection Clause.

As for the "independent constitutional right to self-defense," Plaintiffs concede that "no

case has expressly considered whether a police officer's right to self-defense is protected by the

1   Constitution" but ask the Court to locate it in the penumbrae of other constitutional provisions.

2   (Dkt. No. 59 at 14–17.) Courts are "reluctant to expand the concept of substantive due process

3   because guideposts for responsible decisionmaking in this unchartered area are scarce and open-

4   ended." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992). Executive action such as

5   the Policy violates substantive due process only when it is arbitrary, that is, when it "shocks the

6   conscience." See County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

7          Plaintiffs characterize the Policy as excessively rigid and complicated. (Dkt. No. 59 at

8   17.) They assert that delay and injury will result from the Policy's checks on officers' responses

9   to violent suspects. (Id.) But substantive due process does not guarantee a reasonably safe

10  workplace. Collins, 503 U.S. at 126. It does not shock the conscience to see certain de-escalation

11  procedures imposed on police officers in an effort by their Department to avoid a pattern or

12  practice of excessive use of force. (See generally Policy, Case No. C12-1282JLR, Dkt. No. 107

13  exhibits.) It would be at least surprising if allegations of such a pattern or practice did not lead to

14  the adoption of stricter standards for use of force by officers. Furthermore, the Policy contains a

15  number of concessions to the exigencies of the circumstances. (See, e.g., id. at Ex. 1, p. 3 ("An

16  Officer Shall Use Only the Degree of Force That Is Objectively Reasonable, Necessary Under

17  the Circumstances, and Proportional to the Threat or Resistance of a Subject [. . . ] The

18  reasonableness of a particular use of force is based on the totality of circumstances known by the

19  officer at the time of the use of force and weighs the actions of the officer against the rights of

20  the subject, in light of the circumstances surrounding the event. It must be judged from the

21  perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]

22  The calculus of reasonableness must embody allowance for the fact that police officers are often

23  forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly

24

1    evolving—about the amount of force that is necessary in a particular situation.").) It must also be

2    acknowledged that the Policy provides officers with a wide range of tools to gain control over

3    situations and to protect themselves, from use of verbal commands to physical restraint,

4    TASERS, pepper spray, and batons, in addition to firearms. (See id. at Ex. 1, pp. 8–10.) The

5    Policy is not so inflexible and arbitrary as to shock the conscience, even if it slows or even

6    forestalls the application of force in police interactions with resisting subjects.

7           E.   Procedural Due Process

8           Plaintiffs complain that they were not included in the process by which the Policies were

9    adopted, but they cite to no case imposing such a requirement on government employers. (See

10   Dkt. No. 59 at 20.) Furthermore, Plaintiffs locate the liberty interests of which Plaintiffs were

11   allegedly deprived in the Second and Fourth Amendments, and the Court has already held that

12   Plaintiffs' rights in these areas were not violated. (See id.) Plaintiffs were not due any particular

13   process in the adoption of use-of-force standards by their employer; to the extent they were

14   invited to participate, that participation was a privilege rather than a right.

15          F.   City's Other Arguments

16          The City also argues that Plaintiffs lack standing, fail to state a claim against the Seattle

17   mayor and city attorney, and do not merit injunctive relief. (Dkt. No. 25 at 20–23.) Because the

18   Court concludes Plaintiffs fail to state plausible claims for relief with respect to any defendant,

19   the Court does not reach these questions.

20                                        **Conclusion**

21          Because Defendant Bobb is an agent of the court entitled to quasi-judicial immunity, the

22   Court GRANTS his Motion to Dismiss. (Dkt. No. 19.) In addition, because Plaintiffs' Complaint

23   fails to state a claim for relief under § 1983 or Bivens for violation of their Second or Fourth

24

1  Amendment rights, the Equal Protection Clause, or substantive or procedural due process, the

2  Court GRANTS the City Defendants' Motion to Dismiss. (Dkt. No. 25.) The case is therefore

3  DISMISSED for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Because

4  the Complaint has already been amended once and further amendment would be futile, the

5  dismissal is with prejudice.

6

7          The clerk is ordered to provide copies of this order to all counsel.

8

9          Dated this 17th day of October, 2014.

10

11

12                                              Marsha J. Pechman
13                                              Chief United States District Judge

14

15

16

17

18

19

20

21

22

23

24