UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBERT MAHONEY et al.,<br><br>            Plaintiffs,<br><br>    v.<br><br>ERIC HOLDER et al.,<br><br>            Defendants. | CASE NO. C14-794 MJP<br><br>ORDER ON MOTIONS TO DISMISS |

THIS MATTER comes before the Court on Defendant Merrick Bobb's Motion to Dismiss on quasi-judicial immunity grounds (Dkt. No. 19) and Defendants City of Seattle, Mayor Ed Murray, and City Attorney Peter Holmes's Motion to Dismiss for failure to state a claim (Dkt. No. 25). Certain represented Plaintiffs responded to the Motions, while the remaining pro se Plaintiffs failed to respond. Having reviewed the motions, the Represented Plaintiffs' Responses (Dkt. Nos. 36, 59), Defendant Bobb's Reply (Dkt. No. 54), the City Defendants' Reply (Dkt. No. 62), and all related papers, the Court hereby GRANTS both Motions and DISMISSES the case with prejudice.

1 | **Summary**

2 | In this case, certain officers with the Seattle Police Department are challenging a Use of
3 | Force Policy adopted in response to an earlier lawsuit filed against the City of Seattle by the
4 | United States Department of Justice. In the earlier lawsuit, the Department of Justice claimed
5 | that the Seattle Police Department engaged in a pattern or practice of excessive use of force. As a
6 | condition of settlement, the City of Seattle agreed to create new policies aimed at preventing this
7 | pattern from repeating. One of the key players in creating the Use of Force Policy was Merrick
8 | Bobb, a "Monitor" appointed as an agent of the court to assist in the policy-drafting process,
9 | among other tasks. Although many groups gave feedback as the Use of Force Policy was being
10 | developed, individual officers of the Seattle Police Department were not a party to the lawsuit or
11 | the ensuing negotiations.

12 | The officers now argue the new Use of Force Policy violates their constitutional rights by
13 | constraining their options in defending themselves against potentially dangerous suspects. They
14 | also argue that the way the Use of Force Policy was drafted violates the Constitution. They ask
15 | the Court to stop the implementation of the Use of Force Policy, to declare the Use of Force
16 | Policy unconstitutional, and to award them money damages.

17 | As the Court explains in greater detail below, the officers' constitutional arguments are
18 | not supported by the text of the Constitution or case law interpreting the Constitution. In
19 | addition, the officers cannot sue the court-appointed Monitor Merrick Bobb because he has
20 | "absolute immunity" from lawsuits relating to his actions assisting in the resolution of the earlier
21 | lawsuit. This immunity is known as "quasi-judicial" because it is derived from the immunity
22 | given to judges, and Merrick Bobb is entitled to it both because he was appointed as an agent of

23

24

1  a judge and because he was engaged in activities that parallel those of a judge. Because the

2  officers' case is not supported by the Constitution or case law, the Court dismisses the lawsuit.

**Background**

4  The Represented Plaintiffs and Plaintiffs representing themselves are police officers

5  employed by the Seattle Police Department ("SPD") who have filed suit to challenge the Use of

6  Force Policy ("Policy") adopted by the City of Seattle ("City") pursuant to a consent decree and

7  settlement with the United States Department of Justice ("DOJ"). (Dkt. No. 13 at 3–4; see Case

8  No. C12-1282-JLR, United States v. City of Seattle.) In the first lawsuit, the Department of

9  Justice claimed that after "an extensive investigation of the Seattle Police Department [ . . .], the

10 United States [ ] determined that SPD engages in patterns or practices of using unlawful force

11 that systematically deny the people of Seattle their constitutional rights." (Case No. C12-1282-

12 JLR, Compl. & DOJ Report, Dkt. No. 1 at 2, cited in Am. Compl., Dkt. No. 13 at 3.) The

13 settlement agreement and its central components, including the use of force policy it pledged to

14 produce, had the "goal of addressing the policies, procedures, training, and oversight that the

15 United States alleges contributed to a pattern or practice of constitutional violations." (See Case

16 No. C12-1282-JLR, Joint Motion and Proposed Order for Approval of Settlement Agreement,

17 Dkt. No. 3 at 2–3, cited in Am. Compl., Dkt. No. 13 at 3–4; see also Settlement Agreement,

18 Ryan-Lang Decl., Dkt. No. 12-1 at 17–18, cited in Am. Compl. Dkt. No. 13 at 3–4; id.,

19 Memorandum Submitting Use of Force Policy, Dkt. No. 12-2 at 57–58, cited in Am. Compl.,

20 Dkt. No. 13 at 4.) The agreement included a plan for a court-appointed Monitor. (Dkt. No. 12-1

21 at 52–70; Dkt. No. 12-2 at 5–6.) According to the court-appointed Monitor when he submitted

22 the Policy to the court, the Policy was "calibrated to bring about Constitutional policing without

1  sacrificing the safety and well-being of police officers or the general public." (Dkt. No. 12-2 at
2  58.)

3  Plaintiffs now allege the Policy is too solicitous of the rights of those being policed and
4  insufficiently concerned with the rights of those employed as police officers. (See Am. Compl.,
5  Dkt. No. 13 at 2.) Plaintiffs bring their claims under § 1983 and Bivens, alleging the creation and
6  implementation of the Policy violates their own Second and Fourth Amendment rights, their
7  "right of self-defense as embedded in the Fourth Amendment," the Equal Protection Clause, and
8  substantive and procedural due process. (Id. at 22–28.) They seek a declaration that the Policy
9  infringes on their constitutional rights as well as injunctive relief and damages. (Id. at 28–29.)

10 In addition to the City, Mayor Ed Murray, and City Attorney Peter Holmes, Plaintiffs
11 filed suit against federal actors involved in the settlement agreement and formulation of the
12 Policy. One of those Defendants is Merrick Bobb, the court-appointed Monitor in the underlying
13 litigation. Plaintiffs allege that Mr. Bobb is liable for the constitutional errors they identify in the
14 Policy because he allegedly seized control over the drafting process and refused input from the
15 Seattle Police Department and its officers. (See Dkt. No. 13 at 5.)

16 The City Defendants now move to dismiss the Amended Complaint, arguing Plaintiffs'
17 allegations fail to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 25.)
18 Defendant Bobb also moves to dismiss on the grounds of quasi-judicial immunity. (Dkt. No. 19.)

19 **Analysis**

20 I.  Legal Standards

21  A.  Motion to Dismiss

22  To survive a motion to dismiss, a complaint must state a claim for relief that is plausible
23 on its face. Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Courts follow a
24

1  two-step approach when deciding whether a complaint survives a 12(b)(6) motion. <u>Id.</u> at 678–79.

2  First, "a court must accept as true all of the allegations contained in a complaint" unless the

3  allegations are legal conclusions. <u>Id.</u> Second, the Court must decide whether the claim for relief

4  is plausible—a context-specific task. <u>Id.</u>

5        B.   <u>Evidence and Related Proceedings at the Motion to Dismiss Stage</u>

6        Federal Rule of Evidence 201(b) provides that the Court "may judicially notice a fact that

7  is not subject to reasonable dispute because it . . . can be accurately and readily determined from

8  sources whose accuracy cannot reasonably be questioned." Thus, the Court may take notice of

9  "documents [that] are not physically attached to the complaint . . . if the documents' 'authenticity

10  . . . is not contested' and 'the plaintiffs complaint necessarily relies' on them." <u>Lee v. City of Los

11  Angeles</u>, 250 F.3d 668, 688 (9th Cir. 2001) (citations omitted) (overruled on other grounds by

12  <u>Galbraith v. County of Santa Clara</u>, 307 F.3d 1119, 1125–26 (9th Cir. 2002)). The Court may

13  take judicial notice of "proceedings in other courts, both within and without the federal judicial

14  system, if those proceedings have a direct relation to matters at issue." <u>Bias v. Moynihan</u>, 508

15  F.3d 1212, 1225 (9th Cir. 2007). However, judicial notice may not extend to <u>disputed</u> facts stated

16  within public records. <u>Lee</u>, 307 F.3d at 690.

17    II.   <u>The Monitor and Quasi-Judicial Function</u>

18        Defendant Bobb argues the claims against him must be dismissed because he has

19  absolute quasi-judicial immunity from suit in his role as Monitor. (Dkt. No. 19.) "Absolute

20  judicial immunity insulates judges from charges of erroneous acts or irregular action." <u>Burton v.

21  Infinity Capital Management</u>, 753 F.3d 954, 959 (9th Cir. 2014) (quotation marks and citations

22  omitted). It "is not reserved solely for judges, but extends to nonjudicial officers for all claims

23  relating to the exercise of judicial functions." <u>Id.</u> (quotation marks and citations omitted). "The

24

ORDER ON MOTIONS TO DISMISS- 5

1   proponent of a claim to absolute immunity bears the burden of establishing the justification for
2   such immunity." Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 432 (1993). "To qualify for
3   absolute immunity, the function performed must be a judicial act with 'a sufficiently close nexus
4   to the adjudicative process.' However, 'it is only when the judgment of an official other than a
5   judge involves the exercise of discretionary judgment that judicial immunity may be extended to
6   that nonjudicial officer.'" Burton, 753 F.3d at 960 (citations omitted). "To be protected, the
7   function performed must 'involve the exercise of discretion in resolving disputes.'" Id. Among
8   the nonjudicial officers that have been extended quasi-judicial immunity are bankruptcy trustees,
9   id., and court-appointed special masters. Atkinson-Baker & Assocs., Inc. v. Kolts, 7 F.3d 1452,
10  1455 (9th Cir. 1993).

11      Plaintiffs acknowledge Mr. Bobb was appointed by the Court in the underlying litigation
12  to "oversee implementation of the Consent Agreement." (Dkt. No. 13 at 4.) According to the
13  Order Approving Consensus Use of Force Policies, a document cited by Plaintiffs (Dkt. No. 13
14  at 3), "[t]he role of the court, and the Monitor who serves as an agent of the court, [was] not to
15  dictate policies to the SPD, but rather to insure that the Proposed Policies conform to the
16  requirements of the Consent Decree, the United States Constitution, and judicial decisions
17  interpreting the City's constitutional obligations." (Dkt. No. 12-2 at Ex. 8, p. 65.) Plaintiffs
18  allege that while Mr. Bobb agreed it was not his role to write the Policy (Dkt. No. 13 at 4, citing
19  the Memorandum, Dkt. No. 12-2 at Ex. 7), the Policy was "altered almost in its entirety and
20  replaced with specific language provided, and required, by the Monitor." (Dkt. No. 13 at 5.)
21  According to Plaintiffs, this "language" was the outcome preferred by the DOJ as opposed to the
22  City. (See id. at 5, 27.) The Court must accept for the purpose of this motion that Mr. Bobb
23  seized control over the drafting process, implemented the DOJ's preferred solutions, and refused
24

1  input from other stakeholders such as officers of the Seattle Police Department. The question
2  remains whether these alleged acts deprived him of quasi-judicial immunity for his role in the
3  process.

4  Plaintiffs argue that because the Consent Decree did not grant the Monitor the power to
5  draft the Policy unilaterally, his actions were not "judicial." (See Dkt. No. 36 at 6.) Plaintiffs
6  concede "judicial" acts have been defined by the Supreme Court to encompass "the function of
7  resolving disputes between parties, or of authoritatively adjudicating private rights." (Id. at 5,
8  citing Antoine, 508 U.S. at 435–36.) It is clear that Mr. Bobb was appointed by the district court
9  to oversee formulation of a Policy which was both the product and the subject of an ongoing
10 "dispute between parties"—namely, the City of Seattle and the United States Department of
11 Justice. According to Plaintiffs, Mr. Bobb agreed with the DOJ's preferred solutions and
12 disagreed with the outcome preferred by Plaintiffs (who were not formal parties to the litigation).
13 Still, this alleged course of action does not deprive his conduct of judicial character. Far from it:
14 judges are usually persuaded by one side as opposed to another as they adjudicate disputes in our
15 adversarial system. An outcome that favors one party is no less a "resolution" because it does not
16 please all stakeholders. Here, the Court agrees with Defendant Bobb that even if Mr. Bobb
17 engaged in the conduct Plaintiffs assign to him, he was engaged in an essential judicial function:
18 that of resolving a dispute between the parties to the City of Seattle litigation at the request of a
19 federal district court judge.

20 Furthermore, that function involved discretion. See Burton, 753 F.3d at 960. Plaintiffs do
21 not argue Mr. Bobb was constrained to take a single course of action with respect to the drafting
22 of the policy, in the manner that a court reporter must produce a verbatim transcript of court
23 proceedings. Cf. Antoine, 508 U.S. at 436–37 (holding that court reporters are not entitled to
24

1  quasi-judicial immunity because they are afforded no discretion in carrying out their duties).

2  Rather, Plaintiffs argue that he formulated a policy that contained terms that favored one side in

3  the dispute (Dkt. No. 36 at 4)—in other words, that he used his court-endowed discretion to

4  reach a result Plaintiffs do not agree with.

5  Because Defendant Bobb exercised discretion in resolving a dispute at the request of a

6  district judge, he is entitled to absolute quasi-judicial immunity from suit and the charges against

7  him must be dismissed.

8  III.    City's Substantive Motion to Dismiss

9  The City Defendants move to dismiss on the basis that Plaintiffs' allegations fail to state

10 a claim under the Second or Fourth Amendments, the Equal Protection Clause, or the Due

11 Process Clause. (Dkt. No. 25.)

12     A.  Second Amendment

13 The City Defendants argue the Policy does not violate Plaintiffs' Second Amendment

14 rights because while the Second Amendment protects an individual's right to bear arms, the

15 Second Amendment does not provide that individuals have a right to use a firearm in any

16 particular way. (Dkt. No. 25 at 7.) Plaintiffs contend that the Second Amendment codified a

17 preexisting right to self-defense, and the Policy burdens that right. (Dkt. No. 59 at 4.)

18 The Ninth Circuit has adopted a two-step test for analysis of Second Amendment claims:

19 (1) the court asks whether the challenged law burdens conduct protected by the Second

20 Amendment, and (2) if so, the court determines whether the law meets the appropriate level of

21 scrutiny. See Jackson v. City & Cnty. of San Francisco, 746 F.3d 953, 960 (9th Cir. 2014); see

22 also Peruta v. Cnty. of San Diego, 742 F.3d 1144, 1175 (9th Cir. 2014) (declining to apply a

23 particular level of scrutiny in light of the type of Second Amendment burden imposed).

24

Plaintiffs can point to no case establishing that the Second Amendment codified a free-standing right to self-defense, as opposed to case law interpreting the textual Second Amendment rights to "keep and bear arms" in light of their purposes (which the Supreme Court has held include the facilitation of self-defense). See, e.g., District of Columbia v. Heller, 554 U.S. 570, 628 (2008) ("As the quotations earlier in this opinion demonstrate, the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose."). In the criminal context, the Ninth Circuit rejected the idea that recent Supreme Court cases confirmed a Second Amendment right to use a weapon in any particular way: "[N]either [Heller nor McDonald] concerned the use of a weapon, as distinct from mere possession. . . ." United States v. Morsette, 622 F.3d 1200, 1202 (9th Cir. 2010). Similarly, nothing in the Supreme Court's recent Second Amendment jurisprudence lends support to Plaintiffs' novel theory that a police department policy outlining expectations for an officer's use of force can burden conduct protected by the Second Amendment.

Instead, the Supreme Court has been clear that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Heller, 554 U.S. at 626. Plaintiffs selectively quote historical sources cited in Heller to suggest that so long as self-defense is a purpose for the individual claiming a Second Amendment right, the Second Amendment forbids "unreasonable" restrictions on the manner a weapon is used. (Dkt. No. 59 at 4.) In fact, contemporaneous sources relied on by the Supreme Court and the Ninth Circuit show that restrictions on the manner in which a weapon is used fall outside the scope of the Second Amendment. For example, the Ninth Circuit quoted and the Supreme Court cited the following nineteenth-century footnote: "[I]t is

1  generally held that statutes prohibiting the carrying of concealed weapons are not in conflict with
2  these constitutional provisions, since they merely forbid the carrying of arms <u>in a particular</u>
3  <u>manner</u>, which is likely to lead to breaches of the peace and provoke to the commission of crime,
4  rather than contribute to public or personal defence." <u>The American Students' Blackstone:</u>
5  <u>Commentaries on the Laws of England</u> 84 n.11 (George Chase ed., 3d ed. 1890) (emphasis
6  supplied) (cited in <u>Peruta v. County of San Diego</u>, 742 F.3d 1144, 1165 (9th Cir. 2014) and
7  <u>District of Columbia v. Heller</u>, 554 U.S. 570, 626 (2008)). Similarly, the Ninth Circuit relied on
8  nineteenth-century legal commentator John Ordronaux for the proposition that "the [Second]
9  Amendment has never prevented 'a State from enacting laws regulating the manner in which
10 arms may be carried.'" <u>Peruta</u>, 742 F.3d at 1165. According to the Ninth Circuit, these sources
11 and case law demonstrate that "<u>regulation</u> of the right to bear arms is not only legitimate but
12 quite appropriate." <u>Id.</u> at 1178 (emphasis in original). In addition to the categories of regulation
13 specifically described in <u>Heller</u>, the Ninth Circuit stated, "Nor should anything in this opinion be
14 taken to cast doubt on the validity of measures designed to make the carrying of firearms for
15 self-defense as safe as possible, both to the carrier and the community." <u>Id.</u> at 1178.

16       Here, the Policy represents an effort by an employer, the Seattle Police Department, to
17 regulate the use not only of (employer-issued) weapons but of the force its employees are
18 specially sanctioned to wield on behalf of the city government. This scenario has no relation to
19 the Second Amendment guarantees for individuals recognized in <u>Heller</u>, <u>McDonald</u>, and <u>Peruta</u>.

20       Because the Policy does not burden conduct protected by the Second Amendment, the
21 Court need not proceed to the second step of the analysis. Plaintiffs fail to state a plausible
22 Second Amendment claim.

1     B. <u>Fourth Amendment</u>

2     Plaintiffs' Fourth Amendment argument rests on two grounds: the notion that the Policy itself effects a metaphorical "seizure" (Dkt. No. 59 at 9–11) and the notion that the case law analyzing the limits of citizens' Fourth Amendment rights against the government can be flipped inside out to describe the positive rights of government actors (such as police officers) against citizens (<u>id.</u> at 11–12). Both grounds grossly misconstrue Fourth Amendment law.

    Fourth Amendment seizures of persons are neither figurative nor hypothetical. The definition requires that a government actor "by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement [ . . . ] through means intentionally applied." <u>Brendlin v. California</u>, 551 U.S. 249, 254 (2007). The Policy does not affect officers' freedom of movement, so it does not "seize" Plaintiffs, even if, as Plaintiffs allege, the Policy places them at increased risk of injury. (<u>See</u> Dkt. No. 59 at 9.)

    Plaintiffs further argue that cases analyzing the Fourth Amendment rights of citizens have recognized a "countervailing governmental interest[ ]"—thus purportedly endowing police officers with a Fourth Amendment right to use force. (<u>See</u> Dkt. No. 59 at 11, citing <u>Graham v. Conner</u>, 490 U.S. 386, 396 (1989)). This argument misses the mark entirely. A balancing test establishing the boundary where government action infringes on a citizen's Fourth Amendment rights cannot be reinterpreted as a positive Fourth Amendment right for government actors to inflict force up to that boundary.

    Plaintiffs fail to state a claim under the Fourth Amendment.

    C. <u>Equal Protection Clause</u>

    Plaintiffs base their Equal Protection Clause claim on the idea that the Policy burdens "fundamental rights" embedded in the Second and Fourth Amendments. (<u>See</u> Dkt. No. 59 at 12–

13 (citing <u>Tucson Woman's Clinic v. Eden</u>, 371 F.3d 1173, 1185 (9th Cir. 2004).) The Court has already analyzed Plaintiffs' Second and Fourth Amendment arguments and found them wanting. No Supreme Court case identifies self-defense as a "fundamental right" on par with the right to marry or to vote.

Plaintiffs also fail to make even the most rudimentary showing in an equal protection claim: they fail to describe themselves as members of an affected class similarly situated to those outside the class. <u>See</u> <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."). Plaintiffs, like all officers with the Seattle Police Department, are subject to the Policy; they have identified no group that is similarly situated yet not subject to the Policy.

Plaintiffs fail to state a claim under the Equal Protection Clause.

D. <u>Substantive Due Process</u>

Plaintiffs allege substantive due process claims "for both their rights enumerated in the Second Amendment, Fourth Amendment, and Equal Protection Clause" and "for their independent constitutional right to self-defense." (Dkt. No. 59 at 13–14.) As Plaintiffs acknowledge, substantive due process claims that relate to other constitutional provisions must be analyzed under the legal standards established for those provisions. <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 394 (1989). As the Court has already explained, Plaintiffs fail to state a claim under the Second or Fourth Amendment or the Equal Protection Clause.

As for the "independent constitutional right to self-defense," Plaintiffs concede that "no case has expressly considered whether a police officer's right to self-defense is protected by the

1  Constitution" but ask the Court to locate it in the penumbrae of other constitutional provisions.

2  (Dkt. No. 59 at 14–17.) Courts are "reluctant to expand the concept of substantive due process

3  because guideposts for responsible decisionmaking in this unchartered area are scarce and open-

4  ended." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992). Executive action such as

5  the Policy violates substantive due process only when it is arbitrary, that is, when it "shocks the

6  conscience." See County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

7        Plaintiffs characterize the Policy as excessively rigid and complicated. (Dkt. No. 59 at

8  17.) They assert that delay and injury will result from the Policy's checks on officers' responses

9  to violent suspects. (Id.) But substantive due process does not guarantee a reasonably safe

10 workplace. Collins, 503 U.S. at 126. It does not shock the conscience to see certain de-escalation

11 procedures imposed on police officers in an effort by their Department to avoid a pattern or

12 practice of excessive use of force. (See generally Policy, Case No. C12-1282JLR, Dkt. No. 107

13 exhibits.) It would be at least surprising if allegations of such a pattern or practice did not lead to

14 the adoption of stricter standards for use of force by officers. Furthermore, the Policy contains a

15 number of concessions to the exigencies of the circumstances. (See, e.g., id. at Ex. 1, p. 3 ("An

16 Officer Shall Use Only the Degree of Force That Is Objectively Reasonable, Necessary Under

17 the Circumstances, and Proportional to the Threat or Resistance of a Subject [. . . ] The

18 reasonableness of a particular use of force is based on the totality of circumstances known by the

19 officer at the time of the use of force and weighs the actions of the officer against the rights of

20 the subject, in light of the circumstances surrounding the event. It must be judged from the

21 perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]

22 The calculus of reasonableness must embody allowance for the fact that police officers are often

23 forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly

24

evolving—about the amount of force that is necessary in a particular situation.").) It must also be acknowledged that the Policy provides officers with a wide range of tools to gain control over situations and to protect themselves, from use of verbal commands to physical restraint, TASERS, pepper spray, and batons, in addition to firearms. (See id. at Ex. 1, pp. 8–10.) The Policy is not so inflexible and arbitrary as to shock the conscience, even if it slows or even forestalls the application of force in police interactions with resisting subjects.

E.  Procedural Due Process

Plaintiffs complain that they were not included in the process by which the Policies were adopted, but they cite to no case imposing such a requirement on government employers. (See Dkt. No. 59 at 20.) Furthermore, Plaintiffs locate the liberty interests of which Plaintiffs were allegedly deprived in the Second and Fourth Amendments, and the Court has already held that Plaintiffs' rights in these areas were not violated. (See id.) Plaintiffs were not due any particular process in the adoption of use-of-force standards by their employer; to the extent they were invited to participate, that participation was a privilege rather than a right.

F.  City's Other Arguments

The City also argues that Plaintiffs lack standing, fail to state a claim against the Seattle mayor and city attorney, and do not merit injunctive relief. (Dkt. No. 25 at 20–23.) Because the Court concludes Plaintiffs fail to state plausible claims for relief with respect to any defendant, the Court does not reach these questions.

**Conclusion**

Because Defendant Bobb is an agent of the court entitled to quasi-judicial immunity, the Court GRANTS his Motion to Dismiss. (Dkt. No. 19.) In addition, because Plaintiffs' Complaint fails to state a claim for relief under § 1983 or Bivens for violation of their Second or Fourth

1 | Amendment rights, the Equal Protection Clause, or substantive or procedural due process, the
2 | Court GRANTS the City Defendants' Motion to Dismiss. (Dkt. No. 25.) The case is therefore
3 | DISMISSED for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Because
4 | the Complaint has already been amended once and further amendment would be futile, the
5 | dismissal is with prejudice.
6 |
7 |     The clerk is ordered to provide copies of this order to all counsel.
8 |
9 |     Dated this 17th day of October, 2014.

_____

Marsha J. Pechman
Chief United States District Judge